NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

TOWN & COUNTRY LP GAS SERVICE COMPANY, Respondent.

No. 81–2182.

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1982.

Decided Aug. 16, 1982.

Rehearing and Rehearing En Banc Denied Sept. 21, 1982.

Helen Morgan, Elliott Moore, N.L.R.B., Washington, D. C., for petitioner.

Donald M. Samson, Stiehl & Hess, Belleville, Ill., for respondent.

Before WOOD and ESCHBACH, Circuit Judges, and CAMPBELL,* Senior District Judge.

ESCHBACH, Circuit Judge.

The National Labor Relations Board (Board) petitions for enforcement of its order dated April 23, 1981, which concluded that respondent Town & Country LP Gas Service Co. (company) had violated Sections 8(a)(1), (3) and (4) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3) and (4), by laying off and ultimately discharging its employee, Charles Tressler. We are asked to decide: (1) whether Tressler's conduct in pursuing a successful grievance which resulted in reinstatement and an award of backpay for him after an earlier discharge was an activity protected by 29 U.S.C. § 157; and (2) whether it was proper for the Board to conclude that the periodic layoffs Tressler experienced after being reinstated, and his second discharge, were in retaliation for Tressler's pursuit of the successful grievance and for having filed unfair labor practice charges with the Board. As the company is an employer engaged in commerce within the meaning of the National Labor Relations Act and the alleged unfair labor practices took place at the company's LP gas facility in Chester, Illinois, our jurisdiction is founded on 29 U.S.C. § 160(e). We grant enforcement of the Board's order.

I

Town & Country sells and delivers bulk and cylinder liquid propane, gas appliances and ancillary equipment from its Chester, Illinois facility. The company is a subsidiary of Dashner Gas Service Company of Red Bud, Illinois. Vernon Dashner owns and is the president of both entities, although they are generally operated independently; they have separate payrolls and different customers and employee interchange is infrequent. The relevant bargaining unit is represented by Local 50 of the Teamsters Union and at the times in question consisted of but two persons, Ed Roche and Charles Tressler, who drove Town & Country's delivery trucks and also performed some installation and maintenance work on equipment sold by the company.

For a period of several months prior to February, 1980, truckdrivers Roche and Tressler followed a practice of driving home in company pickup trucks. One of the duties for which they received overtime pay was to answer night calls to make gas deliveries and perform maintenance services for customers, and the practice of driving home in company trucks served the company's purposes to the extent that it made it easier for the drivers to respond to these after-hours calls. President Dashner knew about this practice all along and raised no objections to it while it was occurring. Both drivers ceased driving home in company trucks during the early part of 1980, but the record is unclear as to why they abandoned the practice.[1]

---

\* The Honorable William J. Campbell, Senior District Judge of the United States District Court for the Northern District of Illinois, sitting by designation.

1. In early 1980, Roche moved to a new residence that is a much greater distance from company headquarters than his former residence had been; he apparently ceased driving home in company trucks as a consequence of this relocation. In addition, however, it ap-

On March 21, 1980, some weeks after he had ceased driving company trucks home, Tressler was discharged by Dashner; the reasons given were: "unauthorized use of the pickup truck and for gas burned off the pickup truck." On March 31, 1980, pursuant to the applicable collective bargaining agreement, Tressler filed a grievance concerning his discharge; he filed an unfair labor practice charge with the Board at about the same time.

Near the end of April, 1980, shortly before the collective bargaining agreement was to expire, Dashner and the company's lawyer met with an agent of the local union to consider renewing the contract. During the ensuing discussion, the union officer insisted that Tressler be reinstated. After Dashner rejected this proposal, the union agent said the matter would be taken to arbitration. About one week later, however, the company lawyer contacted the union agent and indicated that a decision had been made to reinstate Tressler with backpay. Later in the same day, Dashner telephoned the union agent and requested resumption of contract talks. On May 13, 1980, in settlement of his grievance, Tressler was allowed to resume work with full backpay. He withdrew the original unfair labor practice charge.

During the second week after he returned to work, Tressler's schedule was reduced from five to three working days per week. After encountering similar two-day layoffs in each subsequent week, Tressler filed a new unfair labor practice charge with the Board on June 19, 1980. Also in mid-June, 1980, Dashner presented Tressler with a company invoice which purported to charge Tressler $4,194 for his previous use of the company's truck. Dashner orally stated "[Y]ou've got your backpay and I want my money." On the afternoon of June 27, 1980, Dashner demanded that Tressler produce the money for the use of the truck. After Tressler responded that

he did not have the money, Dashner handed him a notice of immediate permanent discharge which stated that because of declining sales the company no longer needed the services of two truckdrivers.[2]

## II

After the Board issued an unfair labor practice complaint, a hearing was held in this case before an administrative law judge (ALJ) on September 23, 1980. The ALJ issued his findings and conclusions on November 28, 1980. Based on a determination that Tressler's layoffs and second discharge were not motivated by any anti-union animus on the part of the company, the ALJ recommended that the complaint be dismissed in its entirety. However, in a decision and order dated April 23, 1981, the Board drew a different conclusion from the evidence and decided against the company. The Board concluded that the company had retaliated against Tressler for filing his grievance and unfair labor practice charges. The company was ordered to cease and desist from such discriminatory practices, to reinstate Tressler with backpay and to post a corrective notice.

■ As a general principle, we will defer to the Board's findings if they are supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e). To the extent that the Board has disagreed with the ALJ, ordinarily "we must examine the evidence more closely to determine if it is substantial." *NLRB v. P.P.G. Industries, Inc.*, 579 F.2d 1057, 1058 (7th Cir. 1978). However, an analysis of the Board's analytical framework reveals that although the Board drew its own conclusions from the ALJ's subsidiary factual findings, the Board really did not differ with those basic findings.

■ The Board analyzed the evidence in accordance with its "*Wright Line*"[3] deci-

pears that the drivers ceased taking the trucks home at about the same time it became apparent to them that the trucks needed new tires.

2. Roche, the driver who remained on the payroll, had more seniority than Tressler.

3. *Wright Line, A Division of Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980), *enforcement granted*

sion, which sets forth a bright-line rule for resolving "dual motive" discharge cases. Under the *Wright Line* rule, which this court subsequently endorsed in *Peavey Co. v. NLRB*, 648 F.2d 460 (7th Cir. 1980), the Board's counsel must make a prima facie showing that the employee's protected union conduct was a motivating factor in his discharge, whereupon the burden shifts to the employer to demonstrate that the employee would have been discharged even in the absence of the protected conduct. *Id.* at 461. The Board determined that a sufficient prima facie case of illegal motives had been established and that the company's showing that Tressler's layoffs and ultimate discharge were dictated by a downturn in the company's business was insufficient to rebut the prima facie case. Although the ALJ declined to infer illegal motives, his decision nowhere indicates that the evidence is insufficient to permit such an inference. In fact, the ALJ never identified the reasons for the company's apparently disparate treatment of Tressler. Since the first discharge occurred *before* there were any manifestations of anti-union animus and since the ALJ concluded that the factors which prompted the company to reduce Tressler's work schedule and ultimately discharge him in June of 1980 were the same as those which prompted his earlier discharge, the ALJ reasoned that regardless of the nature of these motives they were not illegal. Furthermore, having declined to infer illegal motives, the ALJ found it unnecessary to determine whether the company's economic conditions could be regarded as a sufficient justification for Tressler's layoffs and ultimate discharge. Thus, the Board's finding of illegal motives represents a departure from the ALJ's reasoning process rather than a rejection of his subsidiary factual findings. Under these circumstances, although we shall examine the evidence rigorously, we nevertheless will sustain the Board's order as long as it is legally sound and supported by substantial evidence.

*sub nom. NLRB v. Wright Line, A Division of Wright Line, Inc.*, 662 F.2d 899 (1st Cir. 1981),

### III

A threshold question is whether Tressler's pursuit of his March 31, 1980 grievance was an activity protected by the federal labor laws. Although the parties have effectively conceded this point, we believe that it warrants some discussion in order to dispel the notion that the pursuit of every manner of individual grievance is, without more, a "protected activity." Section 7 of the National Labor Relations Act provides in pertinent part as follows:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .

Consistent with the statute's emphasis on *collective* activity, this court adheres to the following construction of Section 7:

> "[I]n order to prove a concerted activity under Section 7 of the Act, it is necessary to demonstrate that the activity was for the purpose of inducing or preparing for group action to correct a grievance or a complaint."

*Pelton Casteel, Inc. v. NLRB*, 627 F.2d 23, 28 (7th Cir. 1980) (quoting *Indiana Gear Works v. NLRB*, 371 F.2d 273, 276 (7th Cir. 1967)). This requirement may be satisfied by proof that an individual employee was attempting to enforce provisions of a collective bargaining agreement by way of the grievance procedure, to the extent that such conduct touches on the collective interests of bargaining unit members. *See Pelton Casteel, Inc. v. NLRB, supra*, 627 F.2d at 28 n.10; *NLRB v. Ben Pekin Corp.*, 452 F.2d 205, 206 (7th Cir. 1971).

Although Tressler's March 31, 1980 grievance was primarily an individual complaint, we are satisfied that it was sufficiently related to the local union's collective objectives to come within Section 7. In essence, it was a challenge to disparate treatment of employees. Moreover, the res-

*cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).

olution of the grievance created a precedent that the company might be required to reinstate and award backpay to an employee discharged in violation of the collective bargaining agreement. The fact that Tressler's grievance played a prominent role in negotiations over renewal of the collective bargaining agreement is perhaps the most telling evidence that his grievance was directly related to the employees' mutual interests. These considerations distinguish this case from decisions of this court holding that mere public venting of an individual disagreement with management is not a protected activity. *See, e.g., Pelton Casteel, Inc. v. NLRB, supra; Indiana Gear Works v. NLRB, supra.* The Board was justified in treating Tressler's pursuit of the March 31, 1980 grievance as an activity protected by Section 7 of the Act.

### IV

It is a violation of Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3), to layoff or discharge an employee in retaliation for the exercise of Section 7 rights, *NLRB v. Rich's Precision Foundry, Inc.,* 667 F.2d 613 (7th Cir. 1981), and it is a violation of Section 8(a)(4) of the Act, 29 U.S.C. § 158(a)(4), to retaliate against an employee for filing unfair labor practice charges, *NLRB v. Scrivener,* 405 U.S. 117, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972). The Board held that the company illegally retaliated against Tressler for filing the March 31 grievance by billing him for the use of the truck, by subjecting him to repeated layoffs and by eventually discharging him. The Board also held that the final discharge was motivated in part by animus toward Tressler's filing of the June 19, 1980 unfair labor practice charge.

Allegations of such impermissible motives on the part of an employer pose "question[s] of fact to be determined by the Board from consideration of all the evidence and in making this determination the Board is free to rely on circumstantial, as well as direct evidence." *NLRB v. Rich's Precision Foundry, Inc., supra,* 667 F.2d at

626. Although there is no direct evidence that the company's treatment of Tressler was tainted by illegal motives, it was reasonable for the Board to draw such an inference from the circumstantial evidence adduced in this case.

The concurrence of the following factors has been recognized as providing sufficient grounds for finding retaliatory motivation: manifestations of hostility to union activity; coincidence in time between employees' protected activity and their discharges; good work records regarding the employees; and implausible or shifting explanations for the discharges. *NLRB v. Rich's Precision Foundry, Inc., supra,* 667 F.2d at 626. To a greater or lesser degree, all of these factors were established in this case. When president Dashner presented Tressler with the "invoice" for the use of the pickup truck, Dashner made specific reference to the prior award of backpay in connection with the March 31, 1980 grievance, thereby revealing his dissatisfaction with the outcome of the grievance. The submission of the "invoice," the advent of the layoffs and the eventual discharge all came within a few weeks after the purported settlement of the grievance. Even when viewed without regard to its timing, the "invoice" is suspect because Tressler was the only one called to account for his use of the truck even though Dashner knew all along that both of his drivers had been taking the trucks home. Tressler received no warnings or reprimands during his two-year tenure as a driver, and there is no indication that he had anything less than a good work record. Finally, the termination notice citing economic justifications was given to Tressler immediately after he told Dashner that he could not pay the "rent" for the use of the pickup truck; thus, the company's stated reason for the discharge might be regarded as somewhat "implausible." Accordingly, the Board was entitled to conclude that there was a sufficient prima facie showing under *Wright Line, supra,* of retaliatory motives in violation of Sections 8(a)(1), (3) and (4).

### V

The company sought to rebut the prima facie showing of illegal motives by

proving that because of a substantial reduction in its sales it no longer needed two drivers. Although the company's evidence on this point was significant, there was sufficient testimony to the contrary that the Board was not required to accept the company's showing. The company operates on a fiscal calendar commencing July 1, which happens to be conveniently close to the time of Tressler's final discharge. President Dashner testified that the company's volume of gas sales had declined progressively from 780,000 gallons in 1978 to 650,000 gallons in 1979 and then to 469,000 gallons in the year ending June 30, 1980. Dashner's testimony indicates a decline in gas sales of approximately 40 percent over a period of only two years, and gas sales represent by far the largest part of the company's business. Although a more detailed exposition of the structure of the company's business would have been helpful to the company's case, Dashner's testimony certainly is consistent with the assertion that the company no longer required two drivers. However, as the ALJ commented at the hearing, the company's rebuttal showing was strictly a function of Dashner's oral testimony, which purportedly was derived from the books and records of the company. The company apparently was content to rely on Dashner's oral summary of the records and made no effort to introduce the records themselves into evidence. Dashner's testimony was controverted by Roche and the company's office secretary, Arlou Whittenberg, both of whom testified that the company's business volume in the summer of 1980 was about the same as it had been the year before, when the company was using two drivers. At the September 1980 hearing, Roche, the sole remaining driver, stated that the work load was such that he "[had not] exactly got it handled yet." The company's asserted economic justification for the layoffs which preceded Tressler's discharge was also controverted at the hearing. Roche went on vacation for the last two weeks of June 1980, and although Tressler was the only available driver during that interval the company still refused to allow him to work a full five days per week. Whittenberg testified that when she warned Dashner that Tressler's layoffs would delay gas deliveries, Dashner simply answered that the customers would have to wait a few days, adding that "[i]f we have to lose customers, we'll lose customers."

The Board was confronted with Dashner's testimony on the one hand and with the substantial contrary testimony of Roche and Whittenberg on the other hand. The Board credited the testimony of Roche and Whittenberg. This credibility determination is by no means inconsistent with the ALJ's determination. Although the ALJ believed it unnecessary to determine whether there was a sufficient economic justification for Tressler's discharge, the ALJ's decision does indicate that the company's economic defense was "suspect" inasmuch as Dashner argued with Tressler over the question of "rent" for the truck immediately before he handed Tressler the termination notice citing reduced sales. Accordingly, the Board was entitled to credit the testimony of Roche and Whittenberg, and we are satisfied that their testimony was sufficient to controvert the company's rebuttal evidence.

## VI

The Board's process of evaluating the evidence was consistent with the procedural requirements set forth in *Peavey Co. v. NLRB, supra,* and the Board's ultimate conclusions are supported by substantial evidence on the record as a whole. For the reasons discussed above, we grant enforcement of the Board's order.