**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WEBB FORD, INC., Respondent.**

**No. 81–3022.**

United States Court of Appeals, Seventh Circuit.

Argued May 24, 1982.

Decided Sept. 27, 1982.

Rehearing and Rehearing En Banc Denied Nov. 12, 1982.

Mendelssohn McLean, Elliott Moore—N. L.R.B., Washington, D. C., for petitioner.

Charles E. Murphy, Edward C. Jepson, Jr., Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for respondent.

Before CUMMINGS, Chief Judge, PELL, Circuit Judge, and FOREMAN,* Chief District Judge.

PELL, Circuit Judge.

This case is before the court on the application of the Board for enforcement of its order against the Respondent Webb Ford, Inc. (Company), reported at 258 N.L.R.B. No. 62 (Sept. 30, 1981). The Board therein affirmed the findings and conclusions of the Administrative Law Judge (ALJ) and ruled that the Company had violated sections 8(a)(1) and 8(a)(3) of the Act by discharging employees for protected concerted and union activity; the Board further ruled that the Company had violated those sections by issuing warning notices to the discharged employees as part of a scheme to discharge them for 'pretextual reasons. The case presents three issues for review: (1) was the Company denied a fair hearing and did the ALJ and the Board fail to make independent findings of fact and conclusions of law; (2) does substantial evidence support the Board's finding that protected concerted and union activity was a motivating factor in the issuance of warnings and the decision to discharge the employees; and (3) does substantial evidence support the ALJ's finding that the Company's asserted legitimate reason for the discharges was pretextual. We turn first to a brief recapitulation of the facts as found by the ALJ.

## I. FACTS

### A. Background

The Company operates a retail automobile dealership in northwestern Indiana.

The dealership is divided into departments, including new car prep, service, and front office departments. Local 142 of the Teamsters Union was certified as the bargaining agent for the Company's mechanical and body shop employees, including service department mechanics, on September 22, 1978, following an NLRB election. The Company and the Union signed a collective bargaining agreement on March 16, 1979, which by its terms was retroactive to January 1, 1979.

The agreement changed the method by which service department mechanics were paid. Prior to the signing of the agreement mechanics were paid $150 per week plus a percentage of the hourly rate for which customers or Ford were billed [1] on work the mechanics had completed. Subsequent to the signing of the agreement, mechanics were paid at a fixed hourly rate for the greater of either the numbers of hours they were punched in on the job ("clocked hours") or the number of booked hours; in addition they received a bonus for each hour over forty they either clocked or booked in a given week.

The wage provisions of the new agreement gave rise to a number of problems with the wages of service department mechanics, including the computation of back pay during the retroactivity period, computation of vacation pay, payment of the bonus on overtime, and payment of the mechanics for work on discounted customer specials. Another problem which arose under the new contract was the creation of "unapplied time"—the amount by which clocked hours exceeded booked hours. Because the Company could not bill customers for such time, it lost profits to that extent, and was therefore concerned that such time be kept to a minimum.

---

* James L. Foreman, Chief District Judge for the Southern District of Illinois, sitting by designation.

1. Customers were billed for nonwarranty work at hourly rates ranging from $17 to $23 during the relevant time period. They were charged on the basis of the number of hours assigned to a job by the Chilton Manual, rather than on the basis of the time an employee actually took to complete the job. Ford Motor Co. was billed for warranty work at hourly rates ranging from $16 to $20.55 during the relevant time period. Ford was charged on the basis of the numbers assigned to the job by the Ford Warranty Manual. Hours charged on the basis of either manual are referred to as "booked hours."

### B. *The unfair labor practices*

On March 30, 1979, several service department mechanics, including Jeffrey Goffe and Randall VanderWoude, were gathered in the front office near closing time, questioning the amount of the checks they had just received on the basis that they were improperly computed under the new contract provisions. Company Vice-President Jack Webb arrived upon the scene and questioned the employees about their presence in the office when several customers were waiting for their as yet unserviced cars. Goffe explained that the mechanics were seeking a proper computation of their back pay. Webb informed Goffe that he should not complain because his booked hours had never exceeded his clocked hours under the new agreement, and furthermore that Goffe was a very poor and slow worker. He then fired Goffe on the spot. Goffe had four recent warning letters in his file at the time of his discharge.[2] The incident was resolved, however, on the intervention of the Union Business Agent Joe Kumstar, and the termination converted to a one-day suspension and warning.

As noted above, the Company was concerned that to the extent possible clocked hours not exceed booked hours. Between April and June the amount of excess clocked time in the service department increased by almost four hundred percent, despite an abundance of available work. The Company Business Manager Roberta Perri contacted the Union about this problem in early June, and was informed that an employee's failure to "book guarantee," i.e. to have his booked hours exceed or equal his clocked hours, could be the basis for a warning letter.

During the same three-month period, the service department mechanics, including Goffe and VanderWoude, continued to press for resolution of the various wage disputes which had arisen under the new contract. Company Service Manager George Biederman became disturbed by Goffe and VanderWoude's attitude and their persistent attempts to recover payments they claimed were due them. He threatened VanderWoude that he would be assigned strictly warranty work,[3] and ordered Ray Mason, the Assistant Service Manager, to assign Goffe and Vander-Woude warranty work exclusively, because they were "two of the instigators for the Union."

During the relevant three-month period, Goffe received two additional warning letters for failure to book guarantee. Vander-Woude received six warning letters during the period, three for failure to book guarantee. On June 29, he filed a complaint with the Board charging that the Company had discriminated against him in work assignments on the basis of his engaging in protected activity. On July 13, Perri, still concerned about the high amount of unapplied time, brought the records of the two worst employees to the attention of Jack Webb. Those employees were Goffe and Vander-Woude. Webb then determined to fire the two employees, and did so by writing "Terminated" on the face of their final warning letters for failure to book guarantee. Both employees filed charges with the Board alleging that they had been discharged for their protected concerted and union activities.

## II. DENIAL OF A FAIR HEARING

▆ The Company's first contention is that it was denied a fair hearing because the ALJ was biased and hostile to the Company, and further that the ALJ and the Board failed to make independent findings

---

2. The Union business agent Joe Kumstar had previously informed Jack Webb that three warning letters within a six-month period were sufficient cause for discharge under the contract.

3. The Chilton Manual allows a greater number of hours for completion of a given repair job than does the Ford Warranty Manual. It is therefore more difficult to complete warranty jobs within the allotted time than to complete customer pay work. A higher percentage of warranty jobs would therefore make it more difficult to book guarantee.

of fact but rather merely adopted and incorporated into the ALJ's opinion portions of the General Counsel's brief. Our standard in determining whether an ALJ's display of bias or hostility requires setting aside his findings and conclusions and remanding the case for hearing before a new ALJ is an exacting one, and requires that the ALJ's conduct be so extreme that it deprives the hearing of that fairness and impartiality necessary to that fundamental fairness required by due process. *A. O. Smith Corp. v. NLRB*, 343 F.2d 103, 110 (7th Cir. 1965); *Tele-Trip Co. v. NLRB*, 340 F.2d 575, 581 (4th Cir. 1965). A reading of the transcript makes it clear that the ALJ was impatient and irritated at having to re-try the case.[4] While his repeated comments urging expedition and expressing exasperation reflect regrettable hostility on the part of the ALJ, and certain comments may be read as evidencing an overly solicitous attitude towards the General Counsel, we do not believe the record as a whole reveals such bias and partiality as to require rejection of his findings and conclusions in toto.

██ Nor do we find a sufficient denial of due process in the ALJ's adoption and incorporation of portions of the General Counsel's brief. While we do not as a general rule endorse such a practice, *see Machlett Laboratories, Inc. v. Techny Industries, Inc.*, 665 F.2d 795, 797 (7th Cir. 1981), we have recognized that it is within the discretion of the finder of fact so to do, *id.; Scheller-Globe Corp. v. Milsco Manufacturing Co.*, 636 F.2d 177, 178 (7th Cir. 1980). We find no such abuse of discretion in the instant case sufficient to warrant remand of the case on that basis alone.

## III. SUBSTANTIAL EVIDENCE

The ALJ concluded that Goffe and VanderWoude were engaging in protected concerted activity when they persisted in pressing wage claims under the bargaining agreement, and that they were discharged for engaging in such protected concerted activity. The ALJ evaluated the discharges under the test formulated by the Board in *Wright Line, a Div. of Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980), *enf'd* 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 454 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848. In *Wright Line,* the Board adopted the test established by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), for determining whether a teacher had been fired for permissible or unconstitutional reasons. The Board formulated its test as follows:

> First, we shall require that the General Counsel make a *prima facie* showing sufficient to support the inference that protected conduct was a "motivating factor" in the employer's decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of protected conduct.

*Wright Line,* 251 N.L.R.B. at 1089. This court has followed the *Wright Line* standard in evaluating dual-motive discharge cases. *NLRB v. Town & Country LP Gas Service Co.,* 687 F.2d 187 (7th Cir. 1982); *Peavey Co. v. NLRB,* 648 F.2d 460 (7th Cir. 1981). We turn first to the question whether there was substantial evidence to support the ALJ's finding that the General Counsel had made out a prima facie case and that protected conduct was a factor in the discharge of Goffe and VanderWoude.

The ALJ determined that the General Counsel had made out a prima facie case on the basis of two findings. First, he found that the Service Manager Biederman assigned both employees excessive amounts of warranty work in order to make it more difficult for them to book guarantee. This finding was based almost exclusively on the testimony of Mason, the Assistant Service Manager, which testimony the ALJ credited highly. Second, he found the timing of the July 13 discharges supported the inference that they were unlawfully motivated.

---

4. The case was originally tried in February and March of 1980, but the ALJ who heard the case died before issuing a decision, and the case was tried de novo in August, 1980.

The Board relies on the general rule that credibility determinations are particularly within the province of the trier of fact, and will not ordinarily be overturned by a reviewing court. *See, e.g., Electri-Flex v. NLRB,* 570 F.2d 1327, 1331–32 (7th Cir. 1978), *cert. denied,* 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256; *Sarkes Tarzian, Inc. v. NLRB,* 374 F.2d 734, 736 (7th Cir. 1967), *cert. denied,* 389 U.S. 839, 88 S.Ct. 64, 19 L.Ed.2d 102. However, this court has pointed out repeatedly that evidence of hostility toward an employer by an ALJ will detract from the weight to be accorded his credibility findings, and subject them to a closer scrutiny than might otherwise be the case. *Medline Industries, Inc. v. NLRB,* 593 F.2d 788, 795–96 (7th Cir. 1979); *A. O. Smith Corp. v. NLRB,* 343 F.2d 103, 110 (7th Cir. 1965). Similarly, we have held that although the adoption procedure does not per se constitute an abuse of discretion, it does subject the findings of the trier of fact to a closer scrutiny than would otherwise be the case. *Machlett Laboratories,* 665 F.2d at 797. We believe that examined in this light, there is not sufficient evidence to support the ALJ's conclusions.

 There are two reasons we do not find Mason's testimony sufficiently credible to support the ALJ's conclusions. First, he failed to allow cross-examination of Mason on an important issue relevant to his credibility. Second, he failed to give proper weight to the circumstances under which Mason left the Company's employ. Mason had testified that he was fired by the Company on grounds he considered unjust. On cross-examination, the Company sought to question him on his work record with the Company. The ALJ sustained objections to such questions as irrelevant. We are persuaded that such questions go to the heart of Mason's credibility, and should have been allowed. *NLRB v. Ebner Bros. Packers,* 364 F.2d 565, 567 (5th Cir. 1966); *see NLRB v. M. Koppel Co.,* 412 F.2d 681, 684 (3d Cir. 1969). This failure to permit the Company to elicit such testimony not only further reflects the ALJ's hostility; it substantially undermines Mason's credibility. As the Court of Appeals for the District of Columbia Circuit remarked in a similar situation:

Surely such a statement from an embittered ex-employee cannot support a finding that the Company was illegally motivated in firing [another employee] when there is ample evidence of good cause for the discipline. The finding of the Board that the Company had an illegal motive in firing [the other employee] is not supported by substantial evidence and therefore its order to that effect cannot be enforced.

*Midwest Regional Joint Board v. NLRB,* 564 F.2d 434, 441 (D.C.Cir.1977). We are persuaded, therefore, that the testimony of Mason does not constitute substantial evidence upon which a finding of unlawful motivation for the assignment of work, issuance of warnings, or the discharges can be based.

The ALJ also relied upon the suspicious timing of the July 13 discharges as supporting an inference that they were unlawfully motivated. He noted that they came on the same day, within a week of the filing of five grievances with the Company on the service department mechanics wage issues, and within a few days of VanderWoude's filing of an unfair labor practice charge based on unfair work assignments. We note preliminarily that the existence of an unlawful motive is not to be lightly inferred, *NLRB v. Pfizer, Inc.,* 629 F.2d 1272, 1277 (7th Cir. 1980); *Pelton Casteel, Inc. v. NLRB,* 627 F.2d 23, 30 (7th Cir. 1980), and that "[s]uspicion, conjecture and theoretical speculation register no weight on the substantial evidence scale." *TRW, Inc. v. NLRB,* 654 F.2d 307, 312 (5th Cir. 1981).

 As to the filing of the grievances, we note that five employees filed such grievances, but only Goffe and VanderWoude were discharged. The fact that not all of the employees engaging in the same type of concerted activity were discharged attenuates any inference that the discharge was retaliatory. Furthermore, there was testimony that Company management never received the grievances.

As to the filing of VanderWoude's June 29, 1979, charge, the ALJ himself conceded

that there was no independent evidence that his discharge was retaliatorily motivated. We are persuaded that the timing of the discharges alone is simply too slender a reed to support the finding of a prima facie case of unlawful motivation, and the case does not, therefore, survive the first requirement of the Board's *Wright Line* test. Inasmuch as there is not substantial support for the ALJ's findings and conclusions, our normal course would be simply to deny enforcement. Because the primary focus of our review has been on the ALJ's credibility determinations, however, we prefer not to dispose of the case on that basis, but instead remand the case for further proceedings, to determine whether, when Mason's work record is considered and the circumstances of his discharge properly weighed, there is substantial evidence to support the finding of a prima facie case of unlawful discharge. We regard the record as being insufficient as it now exists upon which to make this determination, and if the Board does engage in further processing of this case, it should be before a different ALJ.

Because we are also persuaded that the ALJ erred both in his formulation and application of the *Wright Line* test, we turn to the question whether there was substantial evidence supporting the ALJ's determination that the Company's asserted reasons for the discharge were pretextual to provide guidance to the ALJ on remand.

■ We turn first to the question whether the ALJ properly articulated the *Wright Line* test. In the recent case of *Behring International, Inc. v. NLRB*, 675 F.2d 83 (3d Cir. 1982), the Third Circuit thoroughly analyzed the procedural aspects of the *Wright Line* test.[5] It concluded that to the extent

a formulation of the test imposed upon an employer the burden of persuasion to show that it would have discharged the employee even in the absence of the protected conduct, it ran afoul of the Labor Act's strictures on burdens of proof as found at 29 U.S.C. § 160(c) (1976).[6] We are persuaded that the Third Circuit analysis is the most appropriate method for resolving dual motive discharge cases. Under the proper test, the ALJ must determine first whether the General Counsel has established a prima facie case of discriminatory discharge. Then the employer must advance some legitimate non-discriminatory reason for its action in order to satisfy its burden of going forward. The General Counsel then has the obligation to prove by a preponderance of the evidence that those proffered reasons were not the Company's true reasons for the discharge. *Accord, NLRB v. Transportation Management Corp.*, 674 F.2d 130 (1st Cir. 1982). *Contra, Zurn Industries v. NLRB*, 680 F.2d 683 (9th Cir. 1982); *NLRB v. Fixtures Manufacturing Corp.*, 669 F.2d 547 (8th Cir. 1982).

■ In the instant case, the ALJ appears to have imposed upon the employer the burden of demonstrating that the decision to discharge would have been the same in the absence of protected conduct. To the extent this formulation imposes the burden of persuasion on the Company, it exceeds the statutory authority granted the Board. The Company need only neutralize the prima facie case by asserting a legitimate reason for the discharges; the burden of demonstrating that reason pretextual remains with the Board.

> If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint.

The Board's regulations interpret this passage as placing the burden of proof of section 8 violations on the Board's attorney. 29 C.F.R. § 101.10(b) (1981).

---

**5.** In *Peavey Co.*, 648 F.2d 460 (7th Cir. 1981), we did not reach the question of the procedural aspects of the *Wright Line* test because the Board had not established a connection between the employees' discharge and the employer's antiunion animus. In *Town & Country LP Gas*, 687 F.2d 187 (7th Cir. 1982), this court found that there was "substantial contrary testimony" rebutting the Company's asserted legitimate reasons. The case is therefore consistent with our analysis as set forth in the text.

**6.** The statute provides in pertinent part:

■ Furthermore, even under his erroneous formulation of the *Wright Line* standard, the ALJ failed to support with substantial evidence his finding that the Company had not demonstrated that it would have taken the same action absent the unlawful motivation.

The ALJ rejected the Company's asserted legitimate reason for firing Goffe and VanderWoude—primarily the substantial amounts of unapplied time both men had racked up under the new contract—on two bases: (1) the two had been subject to disparate treatment; and (2) Biederman had discriminatorily assigned them large amounts of warranty work. As discussed above, that latter finding was based for the most part on the testimony of Mason, which we have found insufficiently credible on this record to support the ALJ's conclusion. We turn therefore to determine whether the ALJ's finding of disparate treatment of the two discharged employees is supported by substantial evidence.

■ The ALJ relied on evidence concerning compensation records of mechanics Finley, Hedrick, Hoffman, McCosh, Schultz, Sunny, Todd, and Wood. Those records showed that they had failed to book guarantee 74 times and received only fifteen warnings in contrast to the numerous warnings issued to Goffe and VanderWoude. While this evidence seems persuasive at first blush, it has several flaws which weaken its evidentiary force. First, four of the above-named employees were not employed during the relevant time period, and their records are therefore of little relevance here. Second, another three of the employees were employed in the new car prep area, and not in the service department. The mechanics in the new car prep area were dependent on the vagaries of new car sales to provide them with work, and thus did not have as much control over the amount of work they received as did the service department mechanics. Comparison of the employees does not, therefore, support a finding of disparate treatment, which is based on unequal treatment of *similarly* situated employees. In addition,

the General Counsel failed to introduce into evidence the records of several employees who did work in the service department during the relevant time period, although those records were produced by the Company, and the General Counsel's failure to introduce them was objected to at the hearing. Those records are highly relevant, if not essential, to the disparate treatment determination, and their absence, coupled with the introduction of irrelevant and misleading records, renders the ALJ's disparate treatment conclusion unsupported by substantial evidence.

We conclude, therefore, on the basis of all the foregoing reasons, that the findings and conclusions of the Board are not supported by the requisite substantial evidence. We deny enforcement and remand the case for further proceedings in accord with this opinion.

Enforcement denied; Remanded for further proceedings.