**G & H PRODUCTS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 82–1911.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 14, 1983.

Decided Aug. 8, 1983.

Thomas R. Crone, Madison, Wis., for petitioner.

Robert Tendrick, N.L.R.B., Washington, D.C., for Elliott Moore—N.L.R.B.

Before CUDAHY and COFFEY, Circuit Judges, and VAN PELT, Senior District Judge.*

COFFEY, Circuit Judge.

This is a petition for review of the National Labor Relations Board's decision ordering the Company to rehire three probationary employees and one clerical worker on the grounds that the Company discharged these employees in violation of the National Labor Relations Act. We deny enforcement of the Order of the National Labor Relations Board.

## I.

The Company employs approximately one hundred production and maintenance employees and has a collective bargaining agreement with the International Association of Machinists and Aerospace Workers that provides that as a condition of employment, all new employees must join the Union on or before the 31st day of their employment. The contract also contains a provision that in exchange for the Company's agreement not to lock out the Union, the Union has agreed that there would be no strike, slow down or work stoppage during the term of the contract. Finally, with respect to new employees, the contract provides:

"Employees hired for the first time, ... will be regarded as probationary employees for the first forty-five (45) working days of actual work with the Company. Such period shall be considered as a trial period to permit the Company to determine such probationary employee's fitness and adaptability for the work required and during such probationary period the Company shall have the exclusive right to terminate such employees without such action being subject to review...."

In early November of 1979, the Company hired three probationary employees, Jack Gerber, Daniel Moore and Michael Mortenson. Gerber was hired by the Company on November 1st at the rate of an experienced lathe operator rather than at the lower trainee rate after he represented to the Company that he had seven years prior experience on a lathe. Moore was hired by the Company on November 5th to do small parts assembly work and other related tasks. However, Moore initially was assigned to general janitorial work because of an industrial injury to another employee. Mortenson was also hired as a laborer on November 5, 1979 to fill the janitorial position of a sweeper on the second shift. At the time of their employment, each of the employees were informed that their employment status was that of a probationary employee for the first forty-five days and further that the Company had a labor contract with the International Association of Machinists providing that each employee must join the Union on or before their 31st day of employment.

In early December, the Company terminated a shop steward production employee and in protest over that discharge, with the exception of the three probationary employees, all of the Company's production employees went out on strike in violation of the no strike clause in the contract.[1]  Dur-

---

* The Honorable Robert Van Pelt, Senior District Judge for the District of Nebraska, is sitting by designation.

1. After the Company and the Union proceeded to grievance arbitration over the employee's discharge, the arbitrator determined that the employee was discharged for just cause (insubordination).  The Administrative Law Judge ("ALJ") and the National Labor Relations Board in the instant case deferred to the finding of the arbitrator that the employee was disciplined for just cause.  Without deciding the issue, the ALJ assumed that the strikers

ing the course of the "wildcat" strike the three probationary employees were assigned tasks other than those for which they were originally hired in order that the Company might maintain its production schedule during the illegal strike. On January 7, 1980, after joining the Union but before the forty-five day probationary period of their employment had elapsed, a Company supervisor informed each of them individually that their work performance was unsatisfactory and that their service with the Company was terminated.

On January 9, 1980 the Union filed an unfair labor practice charge with the National Labor Relations Board alleging that the Company had violated the National Labor Relations Act several days prior to discharging the probationary employees by coercively interrogating Daniel Moore and asking whether he intended to join the strike upon the completion of his forty-five day probationary period. The Union further alleged that the Company discharged the three probationary employees because they intended to join the strike (subsequently determined to be illegal) and the Company hoped that their discharge would discourage other employees from engaging in union activity. The General Counsel for the National Labor Relations Board agreed with the Union and issued a complaint charging the Company with a violation of the National Labor Relations Act. In their answer to the complaint the Company denied discharging the three probationary employees for engaging in union activity, and asserted that the probationary employees were in fact discharged because of unsatisfactory work performance. After a hearing, an Administrative Law Judge found that the Company had coercively interrogated Moore about his intent to join the illegal strike and further that the Company had discharged the three probationary employees in order to discourage union activity

in violation of the National Labor Relations Act. The National Labor Relations Board adopted the ALJ's order and the Company petitions this court for a review of the NLRB's decision.

## II.

Initially, we address the Administrative Law Judge's finding that the Company committed an unfair labor practice when a supervisor approached Daniel Moore and asked him if he intended on joining the illegal strike upon the completion of his forty-five day probationary period. The ALJ held that when the Company supervisor advised Moore that there were two classes of union membership, voting and nonvoting,[2] and questioned Moore as to whether he intended on joining the illegal strike, this "was merely an oblique way of telling Moore that he did not have to be an active or enthusiastic union member . . ." and was thus an unlawful interference with Moore's rights under the National Labor Relations Act.

■ The National Labor Relations Board has long held that it is well within the rights of employers to engage in discussions with their employees about the employees' inclinations or intentions to join a strike. "[W]here the record shows that at the time the questions were asked the Employer had a reasonable basis to fear an imminent strike and merely sought to ascertain the chances for keeping his business open, such inquiries are lawful." *Mosher Steel Co.,* 220 N.L.R.B. 336 (1975). *See also Industrial Towel & Uniform Service Co.,* 172 N.L.R.B. 2254 (1968). This general rule is especially true where the employer questions the employees about their intention to join a strike that he considers to be "wildcat" in nature and illegal. For example, in *Bankers Dispatch Corp.,* 233 N.L.R.B. 300 (1977), after learning that the employees were talking about a possible "wildcat strike" the em-

---

who protested this employee's discharge were striking in violation of the provisions of the no strike clause.

**2.** The record fails to reveal why this supervisor referred to the two alleged classes of union

membership when talking with Moore. However, from our examination of the record we are unable to find convincing evidence to support the ALJ's finding that Moore felt "coerced" during this alleged conversation.

ployer called each individual and asked them if they intended to keep working during the strike if in fact one was called. The National Labor Relations Board held that this was a valid exercise of a management prerogative as the company had received reliable information concerning the potential wildcat strike and had a valid interest in avoiding a complete disruption of business:

> "There is no evidence that these telephone conversations to the various employees interfered with, restrained, or coerced the employees in the exercise of their Section 7 rights in any manner. Nor does it seem reasonable that the ordinary reasonable person would be coerced by such a question from his boss.... There was nothing unlawful in [the employer's] efforts to make certain that he had a full crew to carry on the normal business."

*Id.* at 307.

■ Similarly, in the instant case there was nothing coercive about the Company's supervisor asking Moore whether he intended to join the illegal strike at the completion of his forty-five day probationary period. The Company had an undeniable and protected interest in maintaining production in light of the no strike clause in the contract. When the supervisor approached Moore and asked him about whether he intended to keep working during the illegal strike, he merely wished to ascertain whether the Company would have to hire more personnel to replace Moore if Moore in fact successfully completed his forty-five day probationary period and then joined the illegal strike. As in *Banker's Dispatch Corp.,* "there was nothing unlawful in [the supervisor's] efforts to make certain that he had a full crew to carry on the normal business."

■ Upon examination of the record we also are unable to find any support for the ALJ's decision that the supervisor's statement relating to "voting and nonvoting union membership" was intended to "encourage union dissidence." Clearly, in reaching his conclusion the ALJ relied on speculation and has "read testimony out of context [and] failed to take into account other evidence which conflicts with the conclusion drawn," and in doing so has substituted his own predisposition for the great weight of the evidence. *See NLRB v. Cutting, Inc.,* 701 F.2d 659 (7th Cir.1983). The supervisor's inquiry was one separate question, never repeated to another employee, and we are unable to comprehend how this simple statement could in any way be considered as coercive in nature or meaning. This court has firmly held that the inference of unlawful motive is not to be lightly drawn, and must be based upon substantial evidence in the record and not on conjecture. *See Pelton Casteel, Inc. v. NLRB,* 627 F.2d 23 (7th Cir.1980). The record is barren of testimony to support the NLRB's contention that Moore was "particularly susceptible" to the supervisor's comments. There is no testimony to show that Moore was in fact coerced or that he felt threatened in any way. Instead, the ALJ's contention that the Company intended to coerce Moore into becoming a union dissident is based purely on speculation and conjecture and is not supported by substantial evidence in the record. Therefore, from our review of the record we hold that there was nothing coercive in the supervisor's conduct in asking Moore about his intention to join the illegal strike and therefore the ALJ and the National Labor Relations Board erred in finding that the Company committed an unfair labor practice by allegedly coercing Moore in the exercise of union activities.

### III.

■ We now turn to the ALJ's finding that the Company violated the National Labor Relations Act by discharging the three probationary employees. The National Labor Relations Board adopted without analysis, reasoning or comment the ALJ's finding that in light of the supervisor's questioning of Moore, the Company "was interested in encouraging flaccid, lackadaisical support for the union [and] discharged these three employees because it felt that they were the kind of people who would

strike, not because they had done anything to violate the contract herein or any other contract." In adopting the ALJ's order without comment and failing to give any logical or legal reasons therefore the NLRB summarily approves the Union's petition and the ALJ's order despite the fact that the ALJ's comment that the Company "was interested in encouraging flaccid, lackadaisical support for the union" is contrary to the substantial evidence in the record. We hold that the ALJ's finding runs contrary to the evidence and must be overturned as the Company showed that the probationary employees were discharged for poor work performance rather than due to anti-union animus.

■ The Supreme ·Court has recently adopted the NLRB's *Wright Line* decision, 251 N.L.R.B. 1083 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), as the proper analysis for a dual-motive discharge case such as we are confronted with here. *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).[3] In *Wright Line* the NLRB "determined that the General Counsel carried the burden of persuading the Board that an anti-union animus contributed to the employer's decision to discharge an employee, a burden that does not shift, but that the employer, even if it failed to meet or neutralize the General Counsel's showing, could avoid the finding that it violated the statute by demonstrating by a preponderance of the evidence that the worker would have been fired even if he had not been involved with the union." *Transportation Management,* —— U.S. at ——, 103 S.Ct. at 2471. Under section 10(c) of the National Labor Relations Act, 29 U.S.C. section 160(c), the General Counsel has the burden of proving by a prepon-

derance of the evidence "that the employee's protected conduct was a substantial or motivating factor in the adverse action." *Transportation Management,* —— U.S. at ——, 103 S.Ct. at 2474. If the General Counsel meets its burden the employer can then invoke the affirmative defense that the discharges would have occurred notwithstanding the employee's protected activity.

Here the General Counsel has clearly failed to carry its burden. The Company successfully met and in fact neutralized the General Counsel's attempt at showing that an anti-union animus contributed to the Company's decision to discharge the three employees.[4] In response to the NLRB's contention and evidence that the Company discharged the probationary employees in order to discourage union activity, the Company introduced clear and convincing evidence that the probationary employees were discharged not because of their union activity but rather because of their unsatisfactory work performance. In spite of the fact that it was important to the Company to hire an experienced lathe operator, and this was the reason the Company hired Gerber and paid him at the experienced operator rate, Gerber's work performance was well below the standard the Company expected of an "experienced lathe operator." During the majority of his probationary period a Company supervisor classified Gerber as "quite inexperienced." In fact, during one three-week period of the forty-five day probationary period Gerber consistently performed well below the production rate schedules the Company expected from what they believed to be an "experienced lathe operator." Gerber also made significant errors in measurements while working on one order, which caused an entire order of tub-

---

**3.** In *NLRB v. Webb Ford Inc.,* 689 F.2d 733 (7th Cir.1982), our court relied both on the court of appeals decision reversed in *Transportation Management* (674 F.2d 130 (1st Cir.1982)) and *Behring International Inc. v. N.L.R.B.,* 675 F.2d 83 (3rd Cir.1982). In light of *Transportation Management,* the Supreme Court has vacated *Behring,* —— U.S. ——, 103 S.Ct. 3104, 77 L.Ed.2d 1359 (1983).

**4.** Assuming *arguendo* that the Board met its burden and the Company had to invoke the "affirmative defense," a preponderance of the evidence shows that the employer would have discharged the employees even if they were not allegedly potential union supporters.

ing extensions to be scrapped and resulted in wasted time and materials and added expense to the Company. Gerber not only admitted that he had failed to meet production quotas, but further acknowledged that he was told by Company officials after six weeks that he had made very little progress and that he had not lived up to the Company's expectations.

Similarly, the Company introduced evidence relating to Moore's work performance during his probationary period of employment. A supervisor testified that Moore seemed to do a lot of "goofing off" and this testimony was confirmed by another supervisor who observed that Moore often "took excessive and extensive break periods either in the lunch area or where he was supposed to be working." The supervisor further testified that Moore was not self-motivated and thus needed extensive supervision. Indeed, Moore himself testified that during the strike he often stood around doing nothing and was unsure of how to proceed with the tasks at hand. In summation, one of Moore's supervisors on one occasion commented that Moore "was not giving the Company a fair day's work for a fair day's pay."

In justifying the discharge of Mortenson, a Company supervisor testified that he decided to discharge Mortenson prior to the time Mortenson completed his probationary period because it was his belief that Mortenson was a slow paced employee who did not operate well under the type of incentive system used by the Company. The Company's supervisor testified that the Company looked for upward mobility in its employees, watched for this during the probationary period and expected even those employees hired as sweepers to desire to advance to production work, but that Mortenson did not demonstrate this desire to his supervisors. As was the case with Moore and Gerber, the Company supervisors testified that Mortenson was discharged not because of any union activity or sympathies he may have expressed but because he failed to perform in a satisfactory manner during his probationary period.

In response to the Company's evidence that the three probationary employees were discharged for just cause, the General Counsel for the National Labor Relations Board attempted to elicit testimony demonstrating that the Company's justifications were merely pretexts. All three of the probationary employees testified that during the strike each of them was told by a supervisor that they were doing satisfactory work and that their supervisors appreciated the fact that they frequently had to switch jobs. There was also testimony that when these employees were given their checks after almost eight weeks had elapsed, they were told by a supervisor that he would like to see them continue with the Company after their completion of the probationary period. Furthermore, the ALJ gave an undue amount of weight to the testimony that the probationary employees had not received periodic evaluations during the probationary period and concluded that the Company's discharge of these employees near the end of the forty-five day probationary period indicated a desire on the part of the Company to circumvent potential grievance procedures. We hold after a review of the record that the evidence presented by the General Counsel of the NLRB is insufficient to prove by a preponderance of the evidence that the Company's decision to discharge the employees was based in whole or in part due to anti-union animus and that the Company's justifications for discharging these employees were merely pretextual.

The contractually stated purpose behind the probationary period is to allow the Company "to determine such probationary employee's fitness and adaptability for the work required" and thus the Company is not required to exhaust the grievance procedures due permanent employees prior to discharging probationary employees. It is the very nature of a probationary period in an employment contract which allows a company to evaluate the talents and work habits of their employees to allow the employer to make a well-reasoned judgment as to whether or not to retain them. While the record does disclose that in fact there

were isolated instances of supervisors informing Mortenson and Moore that they were doing satisfactory work at a particular time, testimony was adduced that these statements were made in an attempt to encourage the men to work harder, increase production and create a congenial atmosphere, and were consistent with the Company's need to keep the plant going during the illegal strike. Furthermore, these isolated instances of praise fail to establish satisfactory work performance in support of the decisions of the ALJ and the NLRB that the three probationary employees had in fact demonstrated sufficient job interest and capabilities for the jobs for which they were hired.

It is also significant to note that Company supervisors testified that it was not their practice to frequently criticize probationary employees because it was the Company's policy to appraise the work habits of the probationary employees while they worked on their own, as management attempted to hire as permanent employees only those probationary employees who proved themselves to be self-motivated. It is unquestioned that

> "[t]he Act does not interfere with the normal exercise of the right of the employer to select employees or to discharge them.... [T]he Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than ... intimidation or coercion."

*NLRB v. Jones & Laughlin Corp.,* 301 U.S. 1, 45–46, 57 S.Ct. 615, 628, 81 L.Ed. 893 (1937). Moreover,

> "the Board was not chartered by Congress to right every perceived industrial wrong or to sit in judgment upon an employer's usual exercise of basic management prerogatives to hire and fire. Rather, only where a company trenches upon the rights safeguarded by Section 7 of the Act is the Board empowered to reverse an employer's personnel actions."

*R–W Services System, Inc.,* 243 N.L.R.B. 1202, 1204 (1979). Therefore, because it is consistent with Company's rights under the contract to discharge probationary employees at any time during the probationary period, and as the NLRB has failed to establish by a preponderance of the evidence that the Company's decision to discharge the employees was based in whole or in part on anti-union animus, and that their justifications for the discharges were pretextual, we reverse the decision of the NLRB holding that the Company violated the National Labor Relations Act by discharging the three probationary employees.

IV.

On the afternoon of the same day that the Company discharged the three probationary employees, Suzanne Westphal, one of the Company's clerical workers, after being informed by another employee of the three discharges reportedly spent the remainder of the afternoon sitting at her desk doing nothing. The next morning, Ms. Westphal reported to work at her normal starting time but refused to perform her assigned work and instead spent two hours sitting in the break area. Because Ms. Westphal had performed production work on a regular basis since the beginning of the strike, at approximately 9:30 a.m. a Company supervisor approached Ms. Westphal and directed her to begin working on one of the Company's production machines. She refused, informing the supervisor that she was upset over the discharge of the three probationary employees and further that she was being treated unfairly in not receiving incentive pay for operating the Company's production machines. Westphal advised the supervisor that she refused to perform any more production work, but that she would gladly return to her clerical duties and that she was not quitting. At this point the supervisor informed Westphal that since she refused to work at her assigned task she was terminated.

In conjunction with the unfair labor practice charge concerning the discharge of the three probationary employees, the NLRB's General Counsel further alleged that the Company violated the National Labor Relations Act by discharging Ms. Westphal because of "her concerted and union activi-

ties." The Administrative Law Judge also agreed with the Union's contention that the Company committed an unfair labor practice in discharging Westphal, basing this conclusion on two grounds: first, the ALJ found that because Ms. Westphal was not a member of the bargaining unit, her right to strike was not limited by the contract and therefore if she had indeed joined the illegal strike, her activity would have been protected by the Act and she would have assumed the role of an economic striker; second, the ALJ also found that Ms. Westphal was not joining the illegal strike but was protesting the discharges of the three probationary employees and as such was protesting an alleged unfair labor practice and entitled to the protection of the National Labor Relations Act.

In reaching his conclusion that Westphal was not a sympathy striker, the Administrative Law Judge reasoned that Westphal's primary motivation for refusing to do the production work was the discharges of the three probationary employees. The ALJ found that because Westphal was protesting the discharges of the three probationary employees, she fell into the category of an unfair labor practice striker. However, this holding of the ALJ is in error as it ignores National Labor Relations Board precedent by focusing on what *motivated* Westphal to refuse to perform the struck work rather than focusing on the *nature of the work* itself. In *General Tire & Rubber Co.,* 190 N.L.R.B. 227 (1971), the Board ruled that the focal point must be *"the nature of the activity itself rather than the employee's motives for engaging [or refusing to engage] in the activity."* *Id.* at 229 (quoting *Cooper Thermometer Company,* 154 N.L.R.B. 502, 504 (1965) (emphasis added)). Therefore, NLRB precedent requires the ALJ to examine the *nature* of the production work Westphal refused to perform rather than her *motives* for refusing to work. It is beyond dispute that the production work Westphal refused to perform was the work of the striking employees. Moreover, as in *General Tire & Rubber Co.,* Westphal's "activity by its very nature had the effect of assisting or making

common cause with the striking production workers" as her refusal to operate the production machinery frustrated the Company's attempt to maintain production in the face of the illegal strike. Westphal's refusal to perform production work aided the striking workers in placing greater pressure on the Company while it was attempting to maintain normal operation during the wildcat strike. Since the rights of sympathy strikers "are deemed as those, and only those, with who they sympathize," *American Telephone & Telegraph Co.,* 231 N.L.R.B. 556, 561 (1977), as Westphal was sympathizing with the participants in an illegal strike, her conduct was equally illegal and therefore unprotected by the Act. Thus, the Company was justified in discharging her and her discharge did not violate the National Labor Relations Act.

For the above reasons, we deny enforcement of the National Labor Relations Board's order.

CUDAHY, Circuit Judge, dissenting in part.

This is a troubling case. If our task were to weigh the evidence *de novo,* I might be brought to agree with the majority's result. With all respect, however, I cannot join in an opinion which simply misconceives the role of an appellate court in reviewing the conclusions of an administrative agency.

Our starting point at least, which we may not lightly ignore, is the findings of the ALJ who heard and evaluated the witnesses and their testimony. Both he and the Board concluded that the Company discharged Moore, Mortenson and Gerber on the same day because of their union sympathies and their intention to join the strike and not because of their work performance. This conclusion is based in part on the testimony of the Plant Superintendent, who, according to the Company, made the decision to discharge these three probationers, but who admitted to anticipating that they would join the strike in several days at the end of their probation period. The Superintendent knew that firing them as proba-

tioners would be unreviewable through the grievance procedure.

These same-day discharges were not merely coincidental. Quite apart from such important considerations as the credibility determinations and evidentiary analysis of the ALJ (which the majority completely ignores), *some* deference is due the Board on account of its "special understanding" of the subject matter before us.[1]

> Here, as in other cases, we must recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life and of "appraising carefully the interests of both sides of any labor-management controversy in the diverse circumstances of particular cases" from its special understanding of "the actualities of industrial relations."

*NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963) (citations omitted). "[C]ourts should not 'second-guess the expert administrators on matters on which they are better informed.'" *Americana Healthcare Corp. v. Schweiker*, 688 F.2d 1072, 1087 (7th Cir. 1982).

The majority has, however, overstepped the proper bounds of our review; it has reweighed the evidence as to the legality of these three production workers discharges in the light of its own policy preferences. The majority's preferred position is that these employees' union proclivities did not even *contribute* to their discharge—in the course of a heated strike (which only by an arbitrator's decision has been in retrospect branded "illegal"). The majority also finds "clear and convincing evidence that the probationary employees were discharged . . . because of their unsatisfactory work performance," *supra* at 8–9. Unfortunately for the majority's thesis, the ALJ and the Board found unpersuasive (or, in one in-

stance "untenable and absurd") the evidence and inferences on which the majority would have us rely as "clear and convincing." The majority's complaint that "the ALJ gave an undue amount of weight to the testimony that the probationary employees had not received periodic evaluations during the probationary period," *supra* at 10, simply underlines its inappropriate efforts to substitute its judgment for that of the Board and to try the case *de novo*.

If it were appropriate for this appellate court to "try" this case *de novo,* then we would have to confront directly a great deal of important evidence that solidly supports the Board decision. For example, the majority does not acknowledge that Gerber was working at 180% of his production standard during the week before he was discharged.[2] Similarly, the majority is virtually silent about the fact that the ALJ and the Board credited evidence that supervisors repeatedly made favorable comments about Moore and Mortenson as effective employees. In addition, the majority does not so much as note that on the day Moore, Mortenson and Gerber were fired, G & H's day-shift foreman "voiced to other foremen his personal amazement at this action saying that he did not know what the Company expected 'from these guys because they could not have done any more.'" *ALJ Decision,* Pet.App. at 21.

Viewed fairly, there is certainly substantial evidence on the record as a whole to support the ultimate conclusion of the Board that "the discharges of Moore, Mortenson and Gerber were effectuated to discourage union activity generally, not merely participation in the strike at hand, and as such violated Section 8(a)(1) and (3) of the Act." That ought to be the beginning and the end of our scrutiny of this fact-specific problem.[3]

---

1. To the extent policy considerations are involved here, it would seem appropriate for us to defer significantly to the Board which is, after all, the product of Presidential appointment—and, to that extent at least, responsible to the Executive.

2. Incentive jobs at G & H are usually rated so that an employee is expected to work at 120% of the standard rate.

3. In *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), the Supreme Court reversed a First Circuit decision (674 F.2d 130,

On the other hand, I am inclined to agree with the majority that the supervisor's interrogation of Moore was not coercive and thus violative of Section 8(a)(1). Here the facts are relatively simple. The supervisor's statement and question, although questionable, do not, in my view, cross the line into coercive interrogation.

Similarly, Ms. Westphal's refusal to do production work may have been a protected protest against the unlawful firing of the three probationary employees. But her action, even if its motivation related to the firing of the three probationers, had the *effect* of a sympathy strike and may reasonably be viewed accordingly.[4] Although the Board's conclusion here is certainly not irrational, I think it is necessary to make distinctions that are too fine to be workable to find that the firing of Ms. Westphal violated Section 8(a)(3) and (1).

Nonetheless, clearly as to the termination of the three probationary employees, I think the majority has simply reshaped the evidence and the inferences to accommodate its own predilections. I must, therefore, respectfully dissent.

1st Cir.1981), which we had followed in *NLRB v. Webb Ford,* 689 F.2d 733 (7th Cir.1982). *Webb Ford* held that the General Counsel had the burden of showing not only that a forbidden motivation contributed to the discharge but also, if legitimate motives for discharge are argued, that the discharge would not have taken place independently of the protected conduct of the employee. *Transportation Management* requires the Courts of Appeals to accept the Board's allocation of the burden on the second phase of the analysis, *i.e.,* it is the employer's burden to show as an affirmative defense, if it can, that the employee would have been fired irrespective of the protected conduct. G & H has certainly not carried that burden in the case before us.

Further, I think there are serious questions about the Board's and the courts' recent focus on "but-for" causation and burdens of proof in unfair labor practice cases. It may be that this focus, borrowed from constitutional and employment discrimination cases, is misdirected in the labor relations context. *See* Jackson & Heller, *The Irrelevance of the* Wright Line *Debate: Returning to the Realism of* Erie Resistor *in Unfair Labor Practice Cases,* 77 Nw.U.L.Rev. 737 (1983).

4. I note, however, that Ms. Westphal—unlike the probationary production workers—was not bound by a contractual no-strike clause. Technically, therefore, her sympathy strike may have been a protected economic strike even though it was in concert with a strike by others which was found to be illegal.