**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**P\*I\*E NATIONWIDE, INC., Respondent.**

**P\*I\*E NATIONWIDE, INC., Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

**Nos. 89–2585, 90–1265 and 90–1579.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1990.

Decided Jan. 17, 1991.

Richard A. Cohen, N.L.R.B., Aileen A. Armstrong, John D. Burgoyne, Julie Tigges, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., Joyce Ann Seiser, N.L.R.B., Jeffrey R. Myer, Decarvalho & Myer, Milwaukee, Wis., Joseph A. Szabo, Director, for N.L.R.B.

Daniel M. Leep, Mulcahy & Wherry, Milwaukee, Wis., Peter R. Corbin, James R. Dickinson, Corbin, Dickinson & Duvall, Jacksonville, Fla., for P*I*E Nationwide, Inc.

Before WOOD, Jr., and EASTERBROOK, Circuit Judges, and GRANT, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

This application, petition, and cross-application represent the latest chapter in the

---

* The Honorable Robert A. Grant, Senior District Judge of the Northern District of Indiana, is sitting by designation.

relationship between Patrick Clement and P\*I\*E Nationwide ("P\*I\*E"). It is an association that has given rise, over a seven-year period, to two discharges, no less than three administrative hearings before the National Labor Relations Board ("Board"), and a similar number of enforcement proceedings before this court. It has also produced a series of legal skirmishes in which P\*I\*E has rarely prevailed, and the present actions are no exception.

## I.

P\*I\*E first hired Clement in September 1983 to work as an extra board driver[1] at its Franklin, Wisconsin, terminal. His first discharge from P\*I\*E occurred on October 19, 1983—only one day after Clement had completed his one-month probationary period. It was motivated, in large part, by P\*I\*E's knowledge of and animus toward the fact that the Board had filed prior unfair labor practice proceedings on Clement's behalf, a motivation that was later found by the Board to constitute a violation of section 8(a)(4) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(4). *P\*I\*E Nationwide, Inc.,* 282 N.L.R.B. 1060 (1987), *enf'd, NLRB v. P\*I\*E Nationwide, Inc.,* 894 F.2d 887, 890–91 (7th Cir.1990).

Clement spent most of the next four years searching for a job. He did manage to find some interim employment, but he was unable to hold a position for more than a few months. In particular, he was discharged by Aurora Fast Freight ("Aurora") after only three and one-half months. Subsequent to that termination he received a letter, signed by Aurora's president, which provided in relevant part:

On July 10, 1985, you were instructed to return to Milwaukee with tractor Number 3. You refused to take that tractor and proceeded to take a tractor that you

knew had mechanical problems. On the trip back to Milwaukee you broke down for five hours. If you had returned with the tractor you were instructed to take we would not have had the cost of the breakdown as well as the delay of the freight.

We cannot afford to have people not doing what they are instructed to do. You are hereby discharged effective July 11, 1985.

In the meantime, P\*I\*E negotiated a settlement with the Board. In exchange for the Board withdrawing its application for enforcement, P\*I\*E agreed to post the Board's notice and, on July 8, 1987, reinstated Clement to his former position. The Board and P\*I\*E also entered into a stipulation whereby P\*I\*E reserved its right to a hearing to determine the amount of Clement's back pay.

Clement returned to P\*I\*E's employ only a few months before the company transferred its break bulk facility[2] from Danville, Illinois, to Chicago, Illinois. This change of operations heralded a substantial increase in the number of trips between the Franklin terminal and the Chicago break bulk facility. Moreover, the change of operations allowed the Franklin terminal to send its drivers on up to three trips per shift without violating Department of Transportation ("DOT") safety regulations.[3]

The distance between Franklin and Chicago was short (sixty-nine miles) and the drive was often arduous (traffic jams were quite common, and the trip normally took at least one hour and forty-five minutes). Extra board drivers, on the other hand, were paid by the mile, not the hour; they preferred longer trips with minimal traffic. Thus, it is not surprising that even a single Franklin–Chicago assignment was viewed

---

**1.** An "extra board" driver is an over-the-road driver who is assigned different routes based upon seniority and fluctuations in the flow of freight. Another type of over-the-road driver, the bid driver, is assigned to drive one particular route according to a set schedule.

**2.** A break bulk facility is a terminal operation that receives freight from various satellite facilities and other inbound break bulk facilities.

Employees at the break bulk facility unload this freight, break it down and sort it, and then reload it to a designated trailer for hauling to its ultimate designation.

**3.** *See* 49 C.F.R. §§ 395.3(a)(1), (2) (after an eight-hour rest break, drivers may work a shift of up to 15 hours, 10 hours of which may be spent driving).

with a lack of enthusiasm, and the possibility of three trips per shift was viewed with outright disdain.

As complaints increased and tempers flared, union representative Frank Busalacchi had a telephone conversation with Michael Crowley, P*I*E's labor relations representative. Busalacchi confronted Crowley with the complaints concerning third trips to Chicago. In response to Crowley's adamant insistence that extra board drivers had to make the trips because P*I*E had to move the freight, Busalacchi argued, "[I]f the guys are fatigued, they just ain't going to go." Crowley answered, "I don't have a problem with that," [4] and also stated that the dispatcher, in his discretion, could assign the run to another available driver rather than saddle an employee with a third trip to Chicago.

The Busalacchi–Crowley conversation underwent a transformation as its content was relayed; the drivers came to understand the oral agreement in a manner quite different than Busalacchi. They interpreted the agreement to mean that third trips to Chicago were in the driver's discretion, and that they could reject such dispatches with impunity. Indeed, some of the drivers, including Clement, rejected third trips in the upcoming months and did not always give a reason for the decision. P*I*E, however, took no action against these drivers.

P*I*E did pursue its right to dispute the Board's calculation of Clement's back pay. At a hearing on April 21, 1988, P*I*E argued that Clement's discharge from Aurora constituted a "willful loss of earnings" that would reduce the total amount of back pay sought by the Board. *See Mastro Plastics Corp.*, 136 N.L.R.B. 1342, 1346 (1962), *enf'd*, 354 F.2d 170 (2d Cir.1965), *cert. denied*, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966). The administrative law judge ("ALJ"), relying in large part on the discharge letter from Aurora, later agreed with P*I*E and reduced Clement's back pay award from $102,117.46 to $77,959.72

in a decision announced on September 30, 1988.

The other drivers at the Franklin terminal were well aware of Clement's back pay hearing, and a significant number discussed the proceeding with him. In particular, they discussed the testimony of Larry Scarbrough, P*I*E's line transportation manager. Clement told his coworkers that Scarbrough had failed to produce subpoenaed documents and had answered questions about that failure by stating "I don't know." For whatever reason, Scarbrough's performance at the hearing became the subject of widespread derision among the drivers, who began to answer his questions by stating "I don't know" in a manner that mocked Scarbrough's slight southern accent.

The underlying tensions created by the taunting and the drivers' interpretation of the Busalacchi–Crowley oral agreement came to a head on July 18, 1988. As Clement was completing his paperwork for a shift in which he had already completed two Franklin–Chicago runs, Scarbrough assigned him a third trip to Chicago. Clement, in rejecting the assignment, exhorted: "Larry, you know that we are only required to do two trips. A third trip is up to the driver if he wants to do it or not. I have done my two for the day and I am going home." After Clement continued to refuse the assignment, Scarbrough issued two warnings in rapid succession and fired him.

After a hearing on September 1 and 2, 1988, the ALJ essentially found that the testimony of Clement and his coworkers was credible whereas the testimony of P*I*E's witnesses was incredible. She concluded that Clement's discharge violated sections 8(a)(1) and 8(a)(3) of the Act, 29 U.S.C. §§ 158(a)(1), (3), because Clement had been discharged for reasonably and in good faith invoking a right rooted in a collective bargaining agreement. She also noted that Scarbrough "felt uncomfortable if not humiliated" by his role in Clement's back pay hearing and that the widespread

---

**4.** Crowley's acquiescence to this demand was not surprising; the collective bargaining agreement already gave drivers the right to reject an assignment on the basis of fatigue.

taunting fueled Scarbrough's animosity toward Clement. Based on these two observations, she concluded that the antiunion animus that caused P*I*E to violate section 8(a)(4) when it discharged Clement in 1983 had not subsided when Scarbrough discharged Clement in 1988. She also rejected P*I*E's defense that Scarbrough would have fired Clement regardless of any unlawful motivation.

The Board modified this conclusion, but only slightly. In finding an unlawful motive for purposes of section 8(a)(4), the Board disclaimed reliance on Scarbrough's testimony at the back pay hearing (the testimony that had made him "uncomfortable if not humiliated"). The Board did rely, however, on the drivers' taunting of Scarbrough. This piece of evidence, the Board concluded, established a prima facie case of P*I*E's continued motivation to retaliate against Clement for his use of the Board's remedial processes. The Board filed an application for enforcement on July 27, 1989, and P*I*E thereafter submitted arguments in opposition.

The Board also negated P*I*E's earlier victory in Clement's back pay hearing. After viewing the evidence, the Board assigned less weight to the Aurora discharge letter and concluded that P*I*E had not established a "willful loss of earnings." P*I*E filed a petition for review under 29 U.S.C. § 160(f) on January 31, 1990, and the Board filed a cross-application for enforcement on March 13, 1990. After filing, the petition, cross-application, and application were consolidated for oral argument.

After oral argument, P*I*E changed its name to Olympia Holding Corporation and filed for Chapter 11 reorganization. In bringing this turn of events to our attention, P*I*E cited 11 U.S.C. § 362(a) and hinted that it operated as a stay on the continuation of these proceedings. We hold that the automatic stay provisions of the bankruptcy code do not affect this proceeding and conclude that the Board's cross-application for enforcement should be granted and that the Board's application for enforcement should be granted in part and denied in part.

## II.

### A. The Effect of P*I*E's Chapter 11 Petition

On the filing of a petition for reorganization under Chapter 11, section 362(a) automatically operates to stay "the commencement or continuation ... of a judicial ... proceeding against the debtor." 11 U.S.C. § 362(a)(1). But the broad sweep of section 362(a) is tempered by section 362(b), which states:

> The filing of a petition ... does not operate as a stay—
>
> . . . .
>
> (4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;
>
> (5) under subsection (a)(2) of this section, of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power; . . . .

11 U.S.C. §§ 362(b)(4), (5). Additionally, the legislative history pertinent to section 362(b) notes:

> Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay. Paragraph (5) makes clear that the exception extends to permit an injunction and enforcement of an injunction, and to permit the entry of a money judgment, but does not extend to permit enforcement of a money judgment.

H.R. REP. No. 595, 95th Cong., 2d Sess. 343, *reprinted in* 1978 U.S. CODE CONG. & AD-MIN.NEWS 5963, 6299; *see also* S. REP. No. 989, 95th Cong., 2d Sess. 52, *reprinted in*

1978 U.S. Code Cong. & Admin.News 5787, 5838.

The applicability of the automatic stay provision is a question of law within the competence of the judiciary. *NLRB v. Edward Cooper Painting, Inc.,* 804 F.2d 934, 938–39 (6th Cir.1986); *In re Baldwin-United Corp. Litig.,* 765 F.2d 343, 347 (2d Cir.1985). In fact, we assumed that we had such competence when we held that the predecessor of section 362(a) did not stay the Board's unfair labor practice proceedings. *See In re Shippers Interstate Serv., Inc.,* 618 F.2d 9 (7th Cir.1980). We also stated in dicta that Board proceedings would not fall under the automatic stay provision under the present bankruptcy code, *id.,* and since that time every circuit court addressing the issue, without exception, has held that section 362(a) does not apply to Board proceedings. *See NLRB v. Twin Cities Elec.,* 907 F.2d 108, 109 (9th Cir.1990); *In re Carib-Inn of San Juan Corp.,* 905 F.2d 561, 562 (1st Cir.1990) (Fairchild, Sr. J., sitting by designation); *Edward Cooper Painting,* 804 F.2d at 941 & n. 6; *NLRB v. Evans Plumbing Co.,* 639 F.2d 291, 292–93 (5th Cir.1981); *see also United States v. Nicolet, Inc.,* 857 F.2d 202, 209 (3d Cir.1988); *EEOC v. McLean Trucking Co.,* 834 F.2d 398, 401–03 (4th Cir.1987) (suit by EEOC for entry of money judgment for back pay in Title VII action); *EEOC v. Rath Packing Co.,* 787 F.2d 318, 323–25 (8th Cir.) (same), *cert. denied,* 479 U.S. 910, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986).

■ It should come as no surprise, then, that we now elevate the dicta in *Shippers Interstate* to the level of a holding. The analysis is basic: section 362(b)(4) excepts a governmental unit enforcing a police or regulatory power and section 362(b)(5) excepts a governmental unit enforcing a judgment other than a money judgment. It is beyond dispute that the Board is a governmental unit. Moreover, the Act em-

powers the Board "to prevent any person from engaging in any unfair labor practice ... affecting commerce"—a clear indication that the Board is enforcing a police or regulatory power. 29 U.S.C. § 160(a); *see also NLRB v. Industrial Union of Marine & Shipbldg. Workers,* 391 U.S. 418, 424, 88 S.Ct. 1717, 1721, 20 L.Ed.2d 706 (1968) ("A proceeding by the Board is not to adjudicate private rights but to effectuate public policy."). Additionally, the Board does not run afoul of section 362(b)(5) by attempting to reduce a claim to judgment: the Board is merely seeking entry of judgment and is not trying to seize P*I*E's property to satisfy a money judgment.[5] *Nicolet,* 857 F.2d at 209; *Edward Cooper Painting,* 804 F.2d at 943; *Penn Terra Ltd. v. Department of Env. Resources,* 733 F.2d 267, 275 (3d Cir.1984) (cited with approval in *Ohio v. Kovacs,* 469 U.S. 274, 283 n. 11, 105 S.Ct. 705, 710 n. 11, 83 L.Ed.2d 649 (1985)); H.R.Rep. No. 595, *supra,* at 343 (attempt to fix damages for violation of law would not affect excepted status of action); S. Rep. No. 989, *supra,* at 52 (same), 1978 U.S.Code Cong. & Admin. News 5838, 6299.

## B. *Issues Arising From Clement's 1983 Discharge—The Back Pay Award*

■ P*I*E's petition for review of the Board's back pay award raises only one issue: "Whether a discharge for insubordination from interim employment constitutes a willful loss of earnings justifying a continuing offset of a back pay award under the National Labor Relations Act?" More specifically, P*I*E argues that Clement's discharge from Aurora constituted a willful loss of earnings that would mitigate P*I*E's back pay liability. This argument, in turn, hinges upon the factual determination of whether Clement's discharge from Aurora constituted a discharge for gross misconduct.[6]

---

5. The Board acknowledges that it cannot enforce any judgment through the normal legal processes and recognizes that its only remedy for collection is through the bankruptcy court.

6. P*I*E devotes a substantial portion of its briefs to the legal argument that gross miscon-

duct, if proven, would establish a willful loss of earnings. The purpose of this argument is unclear, for the Board did not base its decision on the ground that gross misconduct could not constitute a willful loss of earnings. On the contrary, the Board recognized that "discharge

Before the ALJ, P\*I\*E presented only one piece of evidence concerning the nature of Clement's discharge from Aurora—the letter signed by Aurora's president. Clement did admit that he was terminated by Aurora and also acknowledged that he subsequently received the letter, but P\*I\*E did not ask him to describe his version of the circumstances surrounding the discharge. Moreover, no one from Aurora was produced to explain the reasons for Clement's discharge.

The ALJ attached significant weight to the Aurora discharge letter, but the Board did not. The Board was dubious because "the statements in the letter of discharge were not made under oath, the declarant did not appear at the hearing and thus was not subject to cross-examination, and the statements were not made to an agent of a witness. Nor do the allegations in the letter of discharge contain any other circumstantial indication of trustworthiness." The Board then rejected this portion of the ALJ's recommendation, concluding that "the Aurora letter of discharge is nothing more than what it appears to be, namely, an interim employer's self-serving and unexamined assertions as to why it discharged Clement."

P\*I\*E's argument in opposition to the Board's order places a great deal of emphasis on the fact that the discharge letter, which was arguably hearsay, was admitted without objection. In placing such emphasis, however, P\*I\*E confuses admissibility with reliability. This is not a case where the Board refused to consider a piece of evidence on the ground that it was hearsay (even though it had been admitted without objection). On the contrary, this is a case where the Board considered a piece of evidence but accorded it little weight.

The fact that the Board plainly considered the discharge letter diminishes the likelihood of success for P\*I\*E's argument that the Board's order is not supported by "substantial evidence on the record considered as a whole." *See* 29 U.S.C. § 160(e). This standard of review does not allow us to dabble in fact-finding, and we may not displace reasonable determinations simply because we would have come to a different conclusion if we reviewed the case de novo. *NLRB v. United Ins. Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968); *U.S. Marine Corp. v. NLRB*, 916 F.2d 1183, 1191 (7th Cir.1990). On the contrary, we must recognize and pay due deference to "the Board's special function of applying the provisions of the Act to the complexities of industrial life." *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963); *see Lapham–Hickey Steel Corp. v. NLRB*, 904 F.2d 1180, 1184 (7th Cir.1990).[7]

Here, after the Board determined the gross amount of back pay due Clement, P\*I\*E had the burden of producing evidence to mitigate its back pay liability.[8] *See NLRB v. United Contractors Inc.*, 713 F.2d 1322, 1329 (7th Cir.1983); *NLRB v. Nickey Chevrolet Sales, Inc.*, 493 F.2d 103, 107–08 (7th Cir.), *cert. denied*, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974). Clement admitted that he had been discharged by Aurora, but a discharge from employment, without more, does not reduce a back pay award. *See Sylvan Manor Health Care Center*, 270 N.L.R.B. 72, 75 (1984); *see also Mid–America Mach. Co.*, 258 N.L.R.B. 316, 319 (1981), *enf'd without opinion*, 718 F.2d 1104 (7th Cir.1983). The only other piece of evidence that P\*I\*E offered was a letter of dubious validity. Clement did not voluntarily dispute the statements in this letter, but the burden of

for cause from interim employment may under some circumstances mitigate an employer's backpay obligation."

7. The fact that the Board disagrees with the ALJ does not change the standard of review. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951); *Weather Shield Mfg., Inc. v. NLRB*, 890 F.2d 52, 57 (7th Cir.1989). Of course, the ALJ's conclusions are

part of the record and must be analyzed accordingly. *See id.*

8. We read the Board's order as concluding that P\*I\*E's evidence did not establish even a prima facie case, and therefore do not reach P\*I\*E's argument that a prima facie showing would satisfy its burden.

**514**

production was on P*I*E, not Clement. Moreover, P*I*E failed to produce evidence that arguably might have been more probative: testimony from a representative of Aurora or testimony from Clement himself. Under the circumstances, the Board supported its conclusion by evidence that was substantial when viewed against the record as a whole. *See Mid–America Mach. Co.*, 258 N.L.R.B. at 319 (business records stating cause of discharge found insufficient evidence to show that employee had not exercised due diligence to retain employment with interim employer).

### C. *Issues Arising From Clement's 1988 Discharge*

P*I*E raises only three issues with respect to the Board's order concerning Clement's second discharge. First, P*I*E argues that Clement's discharge does not violate section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3) because Clement was not involved in "concerted activity" when he refused a third dispatch. Second, P*I*E argues that the Board erred by failing to conclude that Scarbrough would have fired Clement regardless of any unlawful motive that the Board might have established. Third, P*I*E argues that the Board did not establish a violation of section 8(a)(4) of the Act, 29 U.S.C. § 158(a)(4), by substantial evidence. We take each of these arguments in turn.[9]

#### 1. *Section 8(a)(3)*

■ In making its determination on section 8(a)(3) liability, the Board relied on its longstanding rule in *Interboro Contractors, Inc.*, 157 N.L.R.B. 1295, 1298 (1966), enf'd, 388 F.2d 495 (2d Cir.1967). Under the rationale of *Interboro*, an individual employee's assertion of a right grounded in a collective bargaining agreement is "concerted activity," the exercise of which is protected under section 7 of the Act, 29 U.S.C. § 157. *Id.* Thus, when Scarbrough terminated Clement for invoking perceived rights under the Busalacchi–Crowley oral

agreement, the Board viewed that termination as a violation of the Act because it restrained employees in the exercise of rights protected under section 7 and also discouraged membership in a labor organization. *See* 29 U.S.C. §§ 158(a)(1), (3).

In reaching the conclusion that Clement's invocation of the Busalacchi–Crowley agreement constituted "concerted activity," the ALJ found that Clement's activity was in accord with the test spelled out in *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984) (upholding Board's *Interboro* doctrine). In *City Disposal*, the Supreme Court noted that the filing of a grievance by an individual employee constituted "concerted activity" for purposes of section 7 of the Act, and proceeded to the holding that section 7 might also protect a complaint that fell short of a formal grievance. *Id.* at 836, 104 S.Ct. at 1513. In order for section 7 protection to arise, however, the Court concluded that the employee's complaint must be "based on a reasonable and honest belief that he is being, or has been, asked to perform a task that he is not required to perform under a collective-bargaining agreement." *Id.* at 837, 104 S.Ct. at 1514. Moreover, the complaint must be "reasonably directed toward the enforcement of a collectively bargained right." *Id.* Last, "the nature of the employee's complaint [must be] reasonably clear to the person to whom it is communicated." *Id.* at 840, 104 S.Ct. at 1515.

P*I*E challenges the first and last of the ALJ's (and subsequently the Board's) conclusions. First, it disputes the finding that Clement's complaint was reasonably based on a collective bargaining agreement. Noting that Clement's alleged collective bargaining right has no basis outside of the oral agreement between Busalacchi and Crowley, P*I*E proceeds to attack Clement's understanding of that agreement. P*I*E admits that Busalacchi and Crowley had a conversation and that some sort of

**9.** Oddly, P*I*E does not contest the Board's finding of liability under section 8(a)(1). Accordingly, the Board's order with respect to these issues is enforced. *U.S. Marine Corp.*, 916 F.2d at 1183 (uncontested violations of Act are summarily enforced); *Montgomery Ward & Co. v. NLRB*, 668 F.2d 291, 304 (7th Cir.1981) (same).

oral agreement arose out of that conversation, but argues that Clement misinterpreted the terms of that agreement.[10] How can Clement's understanding be reasonable, P*I*E asks, when the only living witness who was privy to the conversation (namely, Busalacchi)[11] refuted Clement's understanding?

■ The flaw with P*I*E's argument lies in the fact that it equates reasonableness with correctness. Though incorrect, however, an employee's understanding of the collective bargaining agreement may nevertheless be reasonable. As the Court noted in *City Disposal*, "[t]he rationale of the *Interboro* doctrine compels the conclusion that an honest and reasonable invocation of a collectively bargained right constitutes concerted activity, *regardless of whether the employee turns out to have been correct in his belief that his right was violated.*" *City Disposal*, 465 U.S. at 840, 104 S.Ct. at 1516 (emphasis added); *see also id.* ("No one would suggest, for instance, that the filing of a grievance is concerted only if the grievance turns out to be meritorious."); *cf. NLRB v. Ben Pekin Corp.*, 452 F.2d 205, 206 (7th Cir.1971). Moreover, the exercise of rights protected under the Act would be severely hampered if employees could face retaliation for good faith interpretations of collective bargaining agreements.

Our analysis must therefore concentrate on Clement's subjective understanding; it does not matter that Clement's state of mind did not comport with P*I*E's understanding. Here, the telephone conversation between Busalacchi and Crowley gave rise to some form of oral agreement. Clement quite clearly believed, on the basis of statements made by other drivers and two union officials, that this agreement allowed him to reject, at his option, a third Franklin–Chicago assignment. He even went so far as to stake his employment on that belief. Moreover, Clement was not alone—four other drivers testified that they, too, had learned of such an agreement, had rejected third trips to Chicago, had not stated a reason, and had not been reprimanded. And as further support, P*I*E neither cross-examined the drivers on these points nor called witnesses to rebut the drivers' assertions.[12] *See NLRB v. Edgar Spring, Inc.*, 800 F.2d 595, 599 (6th Cir.1986) (party's unexplained failure to call seemingly key rebuttal witness suggests that witness's testimony would not have been favorable). In view of these findings, and the irrelevance of P*I*E's understanding of the agreement, we refuse to disturb the Board's conclusion that Clement invoked the oral agreement in good faith.

P*I*E also disputes the conclusion as to the third prong of *City Disposal*—that Clement communicated the basis of his complaint in a "reasonably clear" manner. Specifically, P*I*E argues that Clement never made specific mention of the oral agreement during his verbal exchange with Scarbrough. The *City Disposal* analysis does not require magic words, however; an employee need not say, "I am invoking my

---

**10.** In comparing the oral agreement to the National Master Freight Agreement, the Central States Over–the–Road Motor Freight Supplemental Agreement, and the other written agreements that govern employer-employee relations at the Franklin terminal, P*I*E suggests that the oral agreement cannot legitimately be included under the rubric of "collective bargaining agreement." This suggestion is not well taken, however. As the Supreme Court noted in *City Disposal*, " 'Collective bargaining is a continuing process. Among other things, it involves day-to-day adjustments in the contract and other working rules, resolution of new problems not covered by existing agreements, and the protection of employee rights already secured by contract.' " *City Disposal*, 465 U.S. at 832 n. 9, 104 S.Ct. at 1511 n. 9 (quoting *Conley v. Gibson*, 355 U.S. 41,

46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)) (emphasis deleted).

**11.** Crowley died shortly before the ALJ's hearing.

**12.** Now, before this court, P*I*E challenges the credibility of the drivers' testimony, arguing that they had a vested interest in broadly interpreting the terms of the Busalacchi–Crowley agreement. The ALJ, however, generally found the drivers' testimony to be credible, and we are hard pressed to overrule that determination in the absence of exceptional circumstances. *Roadmaster Corp. v. NLRB*, 874 F.2d 448, 453 n. 4 (7th Cir.1989); *NLRB v. Del Rey Tortilleria, Inc.*, 787 F.2d 1118, 1121 (7th Cir.1986).

rights under the collective bargaining agreement." Indeed, "[i]n the context of a workplace dispute, where the participants are likely to be unsophisticated in collective-bargaining matters, a requirement that the employee explicitly refer to the collective-bargaining agreement is likely to serve as nothing more than a trap for the unwary." *City Disposal,* 465 U.S. at 840, 104 S.Ct. at 1515.

■ In a rendition of facts that P*I*E did not cross-examine (and largely corroborated), Clement testified that he told Scarbrough, "Larry, you know that we are only required to do two trips. A third trip is up to the driver if he wants to do it or not." This statement, in combination with the reasonable inference that Scarbrough must have known of the drivers' practice of summarily refusing third trips because he spent long hours in the Franklin terminal, constituted substantial evidence that the basis of Clement's complaint was "reasonably clear" to Scarbrough.[13]

■ In addition to arguing that the Board erred in concluding that Clement engaged in concerted activity, P*I*E also argues that it produced dispositive proof that Clement would have been terminated absent the protected activity. *See NLRB v. Transportation Mgmt. Corp.,* 462 U.S. 393, 401–03, 103 S.Ct. 2469, 2474–75, 76 L.Ed.2d 667 (1983) (approving Board's allocation of burdens in *Wright Line, a Div. of Wright Line, Inc.,* 251 N.L.R.B. 1083 (1980), *enf'd as modified,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)). Specifically, P*I*E argues that Scarbrough had followed the same procedure in discharging two other employees. The Board was justified, however, in rejecting P*I*E's argument as unconvincing. First of all, the

examples offered by P*I*E involved inapposite factual situations (failure to accept a second Franklin–Chicago dispatch and failure to submit a medical report as required by DOT regulations). More important, Scarbrough's conduct cannot be examined in a vacuum—the Board produced evidence that P*I*E's dispatchers condoned identical conduct by the drivers (including Clement). Under the circumstances, the Board's finding that Clement would not have been fired in the absence of the unlawful motive was supported by substantial evidence. *See id.* at 404, 103 S.Ct. at 2475.

### 2. *Section 8(a)(4)*

■ In order to find P*I*E liable under section 8(a)(4), the Board must conclude that P*I*E discharged Clement because he participated in a specific type of activity, namely, "because he has filed charges or given testimony under" the Act. 29 U.S.C. § 158(a)(4). As the Board concedes, its findings in this regard, particularly its finding of motive, are questions of fact reviewed under the "substantial evidence" standard. *See also Northern Wire Corp. v. NLRB,* 887 F.2d 1313, 1318 (7th Cir. 1989); *NLRB v. Town & Country LP Gas Serv. Co.,* 687 F.2d 187, 192 (7th Cir.1982). Here, the Board's evidence of motive does not even appear substantial in itself, much less substantial on the record as a whole.

The cornerstone of the Board's finding of motive is its inference as to Scarbrough's mental state. We fail to see, however, how the Board can conclude that Scarbrough's reaction to the taunting evidences a continued unlawful animus. Admittedly, Scarbrough may not have taken a "sticks and stones" attitude to the drivers' teasing. And prior Board cases, as approved by this court, establish that evidence of animus

---

**13.** In its reply brief before this court, P*I*E raised the argument that Clement's conduct, even if "concerted," was not "protected." *City Disposal,* 465 U.S. at 837, 104 S.Ct. at 1514. P*I*E has waived this argument, however. Not only did P*I*E fail to raise the argument in its opening brief, *see* 7TH CIR.R. 28(f); *see also FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1025–26 (7th Cir.1988), but the company also failed to raise the argument before the Board. *See* 29 U.S.C. § 160(e) ("No objection

that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."). Moreover, P*I*E has not even claimed, much less established, any extraordinary circumstances that would allow it to bypass the statutory waiver rule in section 160(e). *See NLRB v. American Printers & Lithographers,* 820 F.2d 878, 881 n. 2 (7th Cir.1987).

toward union activity might support the conclusion that P*I*E's 1983 motivation had not abated. *See id.* at 192; *NLRB v. Rich's Precision Foundry, Inc.,* 667 F.2d 613, 626 (7th Cir.1981). Taunting is not union activity, however, and mere evidence of animosity toward union members is not evidence of animus toward union activity.

The Board fails to explain its sleight of hand, and its reasoning is far from self-evident. Certainly, Clement's hearing was a but for cause of the taunting; it was Scarbrough's testimony at Clement's hearing, after all, that became the subject of the drivers' jokes. It does not logically follow, however, that an activity becomes union activity merely because a Board hearing was its but for cause or because it was performed by union members. If a union member had punched Scarbrough as he was leaving Clement's hearing, then we could not automatically say that the punch constituted union activity. Yet that is essentially what the Board has done here. The Board established a retaliatory motivation, but it does not appear to be the type of motivation that has relevance to section 8(a)(4) violations.

In view of our strong doubts concerning the Board's use of the evidence concerning Scarbrough's mental state, we cannot say that the Board's determination of motive finds adequate support in the record. *See Stokely–Van Camp, Inc. v. NLRB,* 722 F.2d 1324, 1329 (7th Cir.1983) (" '[T]he inference of unlawful motive is not to be lightly drawn, and must be based on substantial evidence in the record and not on conjecture.' ") (quoting *G & H Prods., Inc. v. NLRB,* 714 F.2d 1397, 1401 (7th Cir. 1983)); *Pelton Casteel, Inc. v. NLRB,* 627 F.2d 23, 30 (7th Cir.1980) ("We will not lightly infer the existence of an unlawful motive on the part of the employer."). Without its cornerstone, little remains to support the Board's finding of an unlawful motive under section 8(a)(4): the fact that P*I*E violated section 8(a)(4) in 1983, the fact that Clement's discharge occurred less than two months after his testimony at a back pay hearing, and the fact that P*I*E made a questionable statement after Clement was discharged.[14] The Board has never argued that its determination of motive would stand in the absence of its inference concerning Scarbrough's mental state, and its strong reliance on that inference would belie such an argument. Moreover, the sum of the various pieces of evidence does not constitute " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

 In its brief before this court, the Board's counsel argues that other findings, some of which the Board made and others of which the Board might have made, support a finding of unlawful motivation.[15] The problem, though, is that the Board did not use its counsel's rationale; the Board pursued the theory that P*I*E's unlawful motivation in 1983 had not relented by the time of Clement's 1988 discharge. If the Board were like a district court, then we would have little hesitation in combing the record to see if it supported the decision. The Board is not like a district court,

---

14. At a hearing on Clement's second discharge grievance before the Union-management State Area Committee, Clement read a prepared statement that began, "I had been a road driver for P.I.E. Nationwide since ... 1983." A P*I*E representative clarified this statement by noting that Clement's employment had not been continuous because he had been discharged in 1983. This reference, the ALJ found, violated "the spirit if not the letter" of a prior Board order stating that "evidence of ... [Clement's 1983] discharge will not be used as a basis for future personnel actions against him."

15. Specifically, the Board cites *Town & Country,* 687 F.2d at 192, for the proposition that the concurrence of the following factors establish sufficient ground for finding retaliatory motivation: (1) "manifestations of hostility to union activity"; (2) "coincidence in time between employees' protected activity and their discharges"; (3) "good work records regarding the employees"; and (4) "implausible or shifting explanations for the discharges." The Board made findings as to (1), (2), and (4), but not (3). Moreover, the Board used only (1) and (2) in rationalizing its finding of liability under section 8(a)(4).

however, and the differences are material in this instance. The decision of an administrative agency, "unlike those of a district court, cannot be sustained on a ground appearing in the record to which the agency made no reference; to the contrary, the Board's decision stands or falls on its express findings and reasoning." *NLRB v. Indianapolis Mack Sales & Serv., Inc.,* 802 F.2d 280, 285 (7th Cir.1986); *see also Beloit Corp., Castings Div. v. NLRB,* 857 F.2d 1154, 1156 (7th Cir.1988).[16]

"The Board's appellate counsel cannot fill in the holes in the agency's decision; stated in another manner, it is the Board's order, not its petition for enforcement, that is the subject of our review." *Indianapolis Mack,* 802 F.2d at 285. Accordingly, we "may not accept appellate counsel's *post hoc* rationalizations for agency action." *Burlington Truck Lines,* 371 U.S. at 168, 83 S.Ct. at 246; *Loyola Univ. v. Bowen,* 905 F.2d 1061, 1070 (7th Cir.1990); *Indianapolis Mack,* 802 F.2d at 285; *see also SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) (*Chenery I*) (agency action cannot be upheld "merely because findings might have been made and considerations disclosed which would justify its order"); *Local Union 1395, Int'l Bhd. of Elec. Workers v. NLRB,* 797 F.2d 1027, 1036 (D.C.Cir.1986) (court may not presume that Board made findings of fact necessary to defensible decision). And in light of our conclusion that the Board did not support its finding of liability under section 8(a)(4) by substantial evidence, we decline to enforce that portion of the Board's order.[17]

### III.

To recap, we find no merit in P*I*E's assertion that the Board did not adequately consider the Aurora discharge letter. Accordingly, P*I*E's PETITION FOR REVIEW (No. 90–1265) is DENIED and the Board's CROSS-APPLICATION FOR ENFORCEMENT (No. 90–1579) is GRANTED. We remind the Board, however, that we are only entering, and not enforcing, a money judgment. As to the Board order arising out of Clement's second discharge, we similarly find no merit in most of P*I*E's arguments. We do find merit, however, in P*I*E's assertion that the Board's finding of liability under section 8(a)(4) is not supported by substantial evidence on the record as a whole. Accordingly, the Board's APPLICATION FOR ENFORCEMENT (No. 89–2585) is GRANTED IN PART AND DENIED IN PART.

---

**16.** This conclusion is appropriate for at least three reasons. The first is structural integrity. *See NLRB v. Metropolitan Life Ins. Co.,* 380 U.S. 438, 444, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965) ("For reviewing courts to substitute counsel's rationale or their discretion for that of the Board is incompatible with the orderly function of the process of judicial review. Such action would not vindicate, but would deprecate the administrative process for it would 'propel the court into the domain which Congress has set aside exclusively for the administrative agency.'") (quoting *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) (*Chenery II*)); *see also Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 169, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). Second, the deference given to an agency is not granted freely, it is purchased; the agency must exercise its touted expertise and "explain the rationale and factual basis for its decision." *Bowen v. American Hosp. Ass'n,* 476 U.S. 610, 627, 106 S.Ct. 2101, 2112, 90 L.Ed.2d 584 (1986); *Indianapolis Mack,* 802 F.2d at 285 (substantial justi-fication for the administrative process and deference given to administrative decisions is that "an agency possesses an expertise in a particular subject area (here labor relations) that the judiciary, as it is presently structured, cannot acquire at an acceptable cost."); *Brock v. Dow Chem. U.S.A.,* 801 F.2d 926, 932 (7th Cir.1986). Third, it is a longstanding maxim of agency law that "[a] party is entitled ... to know the issues on which decision will turn and to be apprised of the factual material on which the agency relies for decision so that he may rebut it." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 288 n. 4, 95 S.Ct. 438, 443 n. 4, 42 L.Ed.2d 447 (1974).

**17.** As a practical matter, this portion may be quite small. P*I*E treats the conclusion that section 8(a)(4) has been violated as an alternative basis for the Board's order and has not argued that the relief is inappropriate if we conclude that the Board is only partially (as opposed to completely) incorrect.