CALABRESI, Circuit Judge,
dissenting:
The majority’s holding unduly restricts the government’s exercise of regulatory authority under § 362 of the Bankruptcy Code. It does so, moreover, where neither the language of the Code nor the Code’s underlying purposes require such a restriction. Because I believe that the district court’s order in this case was proper, I respectfully dissent.
I.
During a 1994 trial for securities fraud, defendant-appellant Robert E. Brennan transferred assets of $5 million to the Cardinal Trust, an offshore trust located in Gibraltar. Shortly thereafter, on July 14, 1995, the district court ruled that Brennan had defrauded investors and ordered him to pay $75 million in disgorgement and prejudgment interest. See SEC v. First Jersey Sec., Inc., 890 F.Supp. 1185 (S.D.N.Y.1995), aff'd in part and rev’d in part SEC v. First Jersey Sec., Inc., 101 F.3d 1450 (2d Cir.1996), cert. denied, 522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997). Brennan then filed for bankruptcy under Title 11 of the Bankruptcy Code.
In the course of the bankruptcy proceedings, and each time the off-shore trust became vulnerable, the trust was moved, first to Mauritius and then to Nevis. These changes occurred pursuant to a “flight clause,” which allows the trustee to transfer the trust to another country upon an “event of duress” (duress is defined to include “any order, decree or judgment of any court ... which will or may ... in any way control, restrict or prevent the free disposal by the Trustee of any moneys, investments or property in the trust”).
Although Brennan has contended that he has no control over the trust, when he was deposed in February 2000 pursuant to Fed.R.Civ.P. 69(a), he invoked his Fifth Amendment right against self-incrimination and refused to answer questions regarding his control over and access to the trust’s funds. Such an answer in a civil proceeding permits the inference that he did control the trust.[1] Moreover, the Securities and Exchange Commission (“the Commission”) has constructed a time line (showing the coincidence of Brennan’s movements with those of the Cardinal Trust’s trustee, and the communications between them) which strongly suggests that Brennan does indeed exercise control *77 over it. Finally, the Commission points to Brennan’s extravagant life-style, and to the fact that his other assets are tied up in the bankruptcy proceedings, as evidence that he is dissipating the funds of the trust for his personal use.
In mid-1997, the Commission asked the bankruptcy court to appoint a trustee for Brennan’s bankruptcy estate. See 11 U.S.C. § 1104(a)(2) (allowing a bankruptcy court to appoint a trustee if such appointment is in the interest of the creditors). The bankruptcy court found that Brennan had not “pursu[ed] potentially valuable claims on behalf of the estate and [was] not providing adequate financial disclosure,” and, therefore, appointed a trustee. In May 1998, the trustee, in cooperation with the Commission, asked the bankruptcy court to require that Brennan repatriate the assets of the Cardinal Trust. The bankruptcy court denied this application on June 5. The bankruptcy trustee subsequently brought an action in the High Court of St. Kitts and Nevis (as the trust was then in Nevis) to recover the assets of the trust. But that action was dismissed for failure to state a claim under Nevis law.
A year and a half later, on March 30, 2000, believing that “Brennan was about to engage in further overseas travel and that during the course of those travels he would likely transfer the assets of the trust to yet another country,” the Commission applied to the district court for an order (1) directing Brennan to show cause why he should not be held in contempt of the judgment in this case, and (2) requiring him to repatriate the trust and pay its assets into the registry of the court prior to the contempt hearing.[2] The Commission explained that “ ‘it is not seeking to collect the judgment now. Rather, it is seeking information and the return of assets transferred by Brennan so as to preserve them for the benefit of all potential [bankruptcy] claimants.’ ” The assets were to remain in the district court’s registry until a determination by the bankruptcy court as to whether they were part of the bankruptcy estate.[3] And, if they were, they would continue to be held by the court below for distribution by the bankruptcy court. The bankruptcy trustee supported these efforts to repatriate the trust.
After hearing, ex parte, the Commission’s application on April 5, the district court found that the Commission had made a prima facie showing that Brennan was in contempt of the court’s July 14, 1995 order and that the relief sought was warranted. The court therefore granted all of the Commission’s requests and entered an order that Brennan show cause why he should not be held in contempt. At the same time, it directed Brennan to repatriate the assets of the trust into the registry of the court at least two days prior to an April 20 show cause hearing.
The repatriation deadline was subsequently extended to April 21, and the show cause hearing to April 27. On April 20, Brennan sought a stay from the district court, which that court denied. The court, however, granted an interim stay to allow Brennan to seek relief in this court. Accordingly, Brennan moved in our court for a stay pending appeal, but his motion was denied. The district court, nevertheless, granted additional extensions, and, when Brennan still did not comply with the repatriation order, it set May 25 as the date for the contempt hearing. After Brennan and *78 his sons conveyed to the bankruptcy trustee their interests in a separate property, the repatriation deadline was once again moved, this time to July 25, and the contempt hearing was likewise delayed, to August 16.
Brennan now appeals the parts of the district court’s order of April 5 requiring him to show cause why he should not be held in contempt and mandating the repatriation of the Cardinal Trust.
II.
The crux of the issue before us is whether the district court’s repatriation order constitutes the “enforcement ... [of] a money judgment” under 11 U.S.C. § 362(b)(4). Pursuant to § 362(a), virtually all proceedings against a debtor in bankruptcy are stayed. An exception is made, however, in § 362(b)(4), for “the commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit’s ... police and regulatory power.” But this exception does not apply to governmental actions that constitute the enforcement of a money judgment. See id.
The majority, incorrectly in my view, concludes that the Commission’s repatriation order constitutes the enforcement of a money judgment. It notes that several “cases hold that anything beyond the mere entry of a money judgment against a debt- or is prohibited by the automatic stay.” Supra at 71. (emphasis in original). But, in fact, none of the cases that the majority cites is in any way binding on us, and only one of them can be said actually to stand for that proposition. All the others involve side remarks made in other contexts. See EEOC v. McLean Trucking Co., 834 F.2d 398, 401 (4th Cir.1987) (addressing the question of “whether the ... suits were brought to enforce EEOC’s police or regulatory power” as an initial matter, not whether some EEOC action beyond entry of the judgment constituted enforcement of a money judgment) (quotation marks omitted); NLRB v. Edward Cooper Painting, Inc., 804 F.2d 934, 942-43 (6th Cir.1986) (addressing the question of whether the entry of a judgment violated the automatic stay). The only case the majority cites that actually holds that anything beyond the entry of a money judgment is automatically stayed — the Eighth Circuit’s decision in EEOC v. Rath Packing Co., 787 F.2d 318, 326 (8th Cir.1986)—is, moreover, not at all apposite to the instant case. The judgment against Rath Packing called for the transfer of funds directly to the EEOC. And the only reassurance the court had that the EEOC would not “attempt to actually obtain execution of the judgment,” 787 F.2d at 326, during the pendency of the bankruptcy proceedings was the EEOC’s own unsupported promise. Here, in contrast, preventing the actual transfer of funds to the governmental creditor is in no way dependent upon the “promise” of the governmental unit. The trust’s assets, were they to be repatriated, would remain in the district court’s registry. Moreover, the Commission would have no access to them except through bankruptcy proceedings. Accordingly, the majority’s statement that compliance with § 362 would be “dependent] on a governmental unit’s profession of good faith” supra at 73, is simply incorrect. This, as will be shown below, is a crucial difference between our situation and that in Rath Packing.
Not surprisingly, the only case in our circuit cited by the majority is consistent with the above made distinction. Its holding is no more than that “NLRB unfair labor practice proceedings ... are proceedings to enforce the NLRB’s police or regulatory powers.” NLRB v. 15th Avenue Iron Works, Inc., 964 F.2d 1336, 1337 (2d Cir.1992). The court’s passing statement that the governmental unit could not yet “collect” on the money judgment the court had entered was therefore dicta. But significantly, even that dicta provides no support for the majority’s position. I do not doubt that the collection of a judgment would in the ordinary course consti *79 tute the enforcement of a money judgment. In asking the court to seize the assets of the Cardinal Trust through repatriation, however, the Commission in this case does not seek to satisfy, or collect on, its 1995 judgment. Rather, the Commission aims to have the assets brought back in order to place them at the disposal of the bankruptcy court. That in 15th Ave. Iron Works, our court stated that collection would be stayed under § 362(b)(4) therefore provides no guidance as to governmental actions that, like the repatriation order before us, fall somewhere in between the entry of a judgment and its collection.
The majority’s prohibition of any governmental action beyond the entry of a money judgment thus fails to find adequate support in the existing case law. It also finds none in the language of § 362(b)(4). For the “enforcement” of a money judgment that is forbidden can as readily refer only to those moves that are meant to favor the governmental action in relation to other creditors as it can to any step that is taken beyond the entry of the judgment.
Because neither language nor authority suffices to justify the majority’s restrictions on the government’s power to regulate this trust, we must look to the section’s purpose, to the “mischief’ it was designed to avoid in order to determine its meaning. See, e.g., Heydon’s Case, 3 Co. Rep. 7a, 7b, 76 Eng. Rep. 637, 638 (1584) (noting that “the office of all the Judges is always to make such construction as shall suppress the mischief, and advance the remedy”); accord Gorris v. Scott, L.R. 9 Ex. 125 (1874). This is the same as examining the majority’s underlying concerns for a persuasive justification for its decision. Once again, however, such an inquiry fails to support the majority’s result.
The majority emphasizes, rightly, that the policy behind the automatic stay, its function, is “ ‘to grant complete, immediate, albeit temporary relief to the debtor from creditors, and also to prevent dissipation of the debtor’s assets before orderly distribution to creditors can be effected.’ ” Supra at 70 (quoting Penn Terra Ltd. v. Department of Envtl. Resources, 733 F.2d 267, 271 (3d Cir.1984)). But this principle does not, as the majority holds, imply that any governmental action is automatically stayed if it requires either the outlay of debtor assets during bankruptcy proceedings or the third-party control of those assets. It only means that the bankruptcy court’s power over the ultimate distribution of the assets and their allocation among creditors must remain unhampered by such governmental steps. Indeed, to hold otherwise contravenes considerable precedent and undermines the very goal the majority’s holding purports to effectuate.
Existing case law provides that even some government actions that require a debtor to expend funds during the pen-dency of the bankruptcy proceedings are not necessarily “enforcements of a money judgment” that are automatically stayed. For example, the costs of environmental clean-up may be imposed upon debtors despite the automatic stay. See City of New York v. Exxon Corp., 932 F.2d 1020, 1024 (2d Cir.1991) (holding that New York City’s action under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) comes within the exception despite the costs of the environmental clean-up to the debtor); see also Penn Terra Ltd. v. Department of Envtl. Resources, 733 F.2d 267 (3d Cir.1984) (holding that the Commonwealth’s injunction against the debtor to correct violations of state environmental protection statutes was excepted from the stay). These cases make clear, therefore, that a financial loss to a debtor does not, on its own, justify applying the automatic stay provision to governmental action brought against a debtor.
It follows, a fortiori, that the fact that Brennan stands to lose control of the assets in the Cardinal Trust does not in itself transform the district court’s order *80 into an enforcement of a money judgment under § 362(b)(4) for here, none of the money repatriated is even expended. Rather, the enforcement that is prohibited by § 362(b)(4) occurs, as this court and others have stated in the past, at the time of “collection,” see 15th Ave. Iron Works, 964 F.2d at 1337—when “a plaintiff attempts to seize property of the defendant in order to satisfy ... the judgment obtained by a plaintiff-creditor.” See NLRB v. Continental Hagen Corp., 932 F.2d 828, 834 (9th Cir.1991) (emphasis added); Penn Terra, 733 F.2d at 275 (3d Cir.); NLRB v. P*I*E* Nationwide, Inc., 923 F.2d 506, 512 (7th Cir.1991). It occurs, in other words, when the government’s action with respect to the judgment would have the effect of benefitting itself at the expense of other creditors. But, in this case, since the Commission will not receive any of Brennan’s repatriated assets unless and until the bankruptcy court has determined their proper disbursement, the repatriation order in no way amounts to a satisfaction or an enforcement of the 1995 disgorgement judgment. Accordingly, Brennan’s loss of control over the trust, as to which he contends he has no control anyway, does not constitute a satisfaction of the Commission’s judgment and it is certainly not a sufficient reason to subject the repatriation order to the automatic stay.
The notion that it is the desire to prevent steps that might favor the government as creditor over other creditors (rather than the effect such actions might have on the debtors control over the relevant assets) that motivates § 362(b)(4)’s prohibition, also finds support in the several cases in which courts have allowed governmental units to freeze assets or place them in receivership during bankruptcy proceedings. Thus, where courts have feared the dissipation of assets still under a debtor’s control, they have regularly countenanced governmental action to safeguard those assets during the pendency of the bankruptcy proceedings. See CFTC v. Co Petro Marketing Group, Inc., 700 F.2d 1279 (9th Cir.1983) (upholding the district court’s appointment of a receiver and finding that it did not constitute “the enforcement of a money judgment”); SEC v. First Fin. Group, 645 F.2d 429, 438 (5th Cir.1981) (holding that the district court’s appointment of a receiver was excepted from the automatic stay where “it [was] likely that, in the absence of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste”); R.A. Walker, 37 B.R. at 611(“[S]ection 362(b)(5) [incorporated into current section 362(b)(4) ] of the Bankruptcy Code permits a district court to enter an injunction against the transfer of assets and to enforce that injunction so long as it does not amount to the enforcement of a money judgment.”).
As these courts have repeatedly noted, obtaining this type of control over a debt- or’s assets “merely protects and preserves the assets from further transfer or dissipation by the defendants. The ultimate distribution of those assets which are determined to be part of the property of the estate may still be made by the Bankruptcy Court.” R.A. Walker, 37 B.R. at 611-12 (citations and quotation marks omitted). While these “asset freeze” cases concededly do not involve actions taken on a money judgment, the result is precisely the same as that which would be effectuated by the district court’s repatriation order. For, under the lower court’s holding, Brennan would be unable to continue to dissipate the assets of the Cardinal Trust, and those assets would be preserved for disbursement to all creditors at the discretion of the bankruptcy court.
Because affirming the district court’s order in this case would have furthered the majority’s stated goals of preventing the favoring of particular creditors and the dissipation of a debtor’s assets, it is hard to understand the majority’s opinion unless that opinion is more concerned with the Commission’s motives in pursuing the repatriation of the trust’s assets rather *81 than with the ultimate effect of such repatriation. And the opinion does state that the Commission “is plainly seeking to satisfy at least part of the July 1995 Judgment from the assets of the Cardinal Trust. Accordingly, under the plain terms of § 362(b)(4), the Repatriation Order violates the automatic stay.” Supra at 73. I do not dispute that the Commission’s goal was ultimately to obtain part of the disgorgement judgment, and indeed to protect its interests in that judgment from dissipation by Brennan. I dispute the relevance of this fact.
The majority seems to assume that the combination of detriment to the debtor and the governmental unit’s goal of receiving some of the assets at some later date converts the repatriation order into an enforcement of a money judgment. But the same combination — detriment to the debt- or and desire to protect one’s interest— was present in the government’s, con-cededly valid, seeking of the entry of the 1995 judgment against Brennan in the first place. And the majority’s leap from the Commission’s goal (of ultimately collecting on its judgment) to the conclusion that the district court’s order actually constituted the enforcement of a money judgment is as unwarranted as it is unexplained. I believe, rather, that the proper inquiry must focus on the objective result of the district court’s order, which in this case is to place additional assets at the bankruptcy court’s disposal. For, as the majority opinion itself notes, the purpose of excluding the enforcement of money judgments from the governmental exception to the automatic stay is simply “to prevent the Government from gaining ‘preferential treatment’ in bankruptcy proceedings ‘to the detriment of other creditors.’ ”[4] Supra at 75. (quoting S.Rep. No. 95-989 at 52 (1978), U.S. Code Cong. & Admin. News at 5838; H.R. Rep. 95-595 at 343 (1978), U.S. Code Cong. & Admin. News at 6299).
This is why § 362(b)(4) in effect seeks to distinguish between actions taken by governmental units in their capacities as regulators — which are excepted from the automatic stay — and those taken by governmental units in their capacities as creditors — which are not. “[T]he money judgment provision in section 362(b)(4) should be construed to balance the government’s need to enforce its police or regulatory power with the estate’s need to preserve its assets for the reorganization of the debtor.” 3 Collier on Bankruptcy § 362.05[5][b], at 64.2 (15th ed. rev.2000); see generally id. at 58-63. In order to protect other creditors, governmental units must occasionally be prevented from abusing their regulatory role. This happens when the government employs its regulatory powers to advantage itself as a creditor. The instant case is not, however, one of those occasions, as there is no tension here between the Commission’s enforcement of its regulatory power and the preservation of Brennan’s assets. The Commission cannot receive preferential treatment as a result of the district court’s order. For the Commission would not be able to satisfy its judgment as a result of the district court’s order, except as one of Brennan’s debtors in bankruptcy court. As a result, the district court’s order does not harm Brennan’s non-governmental creditors and thus cannot constitute a forbidden preference to the government.
This would seem to settle the matter, since the majority itself identifies no such harm. But the majority appears to deem the Commission’s very right to appeal to a forum other than the bankruptcy court for the repatriation of Brennan’s assets to be a measure of preferential treatment and hence to be forbidden. Yet, in enacting § 362, that was precisely what Congress intended. Congress explicitly excepted the government when it is acting pursuant to its regulatory powers from the automatic stay in order to prevent debtors from *82 “frustrating necessary governmental functions by seeking refuge in bankruptcy court.” Exxon Corp., 932 F.2d at 1024 (quotation marks omitted). And to effectuate this exception and its purposes, Congress granted both the bankruptcy court and the district court jurisdiction to determine when the governmental exception to the automatic stay applies. See In re Baldwin-United, Corp. Litigation, 765 F.2d 343, 347 (2d Cir.1985) (“The court in which the litigation claimed to be stayed is pending has jurisdiction to determine not only its own jurisdiction but also the more precise question whether the proceeding pending before it is subject to the automatic stay.”). It follows that seeking relief in the federal district court cannot constitute prohibited preferential treatment.
* * * * * *
Once we recognize that the crucial question in this case, and in the application of § 362(b)(4) generally, is whether the government’s action enables the government to enrich itself at the expense of nongovernmental creditors,[5] we can see how unduly restrictive on governmental regulatory authority the majority’s decision is. As the majority recognizes, and even emphasizes, the object of § 362(a) is “to prevent dismemberment of the estate and insure its orderly distribution.” First Fin. Group, 645 F.2d at 439. But the result of the Commission’s action and the district court’s order would, instead, be to bring the assets under the control of the bankruptcy court and thereby to prevent their dissipation. And the Commission’s behavior, therefore, facilitated, rather than subverted, the central goal of the automatic stay. Similarly, the district court’s order “aid[ed] future administration and disposition of the estate by preserving the assets” for the bankruptcy court. R.A. Walker, 37 B.R. at 611.[6] No non-governmental creditors, moreover, would suffer any harm as a result of the repatriation order. Indeed, as the bankruptcy trustee’s support of the Commissions action in this case indicates, Brennan’s creditors, not simply the Commission, would be better off if Brennan were made to repatriate the Cardinal Trust. Only “wrongdoer” Brennan, who I fear has successfully manipulated this court into providing him with a “haven” in bankruptcy, would suffer any possible loss at all. In re Berry Estates, Inc., 812 F.2d 67, 71 (2d Cir.1987).
For all these reasons, I would affirm the district court and hold that its order was excepted from the automatic stay under § 362(b)(4).

. See Baxter v. Palmigiano, 425 U.S. 308, 318-20, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) (Fifth Amendment does not prohibit drawing adverse inferences when a party in a civil action invokes the privilege against self-incrimination); LiButti v. United States, 107 F.3d 110, 121 (2d Cir.1997) (same).

. The Commission also sought to: compel Brennan to account for all the assets in which he has any beneficial interest or over which he exercises control; freeze all assets not part of the bankruptcy estate; order him to surrender his passport; prohibit him from international travel; and restrain him from interfering with the jurisdiction of the district court.

. There has not yet been a final determination of whether the Cardinal Trust is part of the bankruptcy estate. The district court’s order preserves the trust's assets in the event that it is determined to be so. See FTC v. R.A. Walker & Assocs., Inc., 37 B.R. 608, 611 n. 6 (D.D.C.1983) (freezing assets that “may not even be part of the property of the estate ’’) (quotation marks omitted).

. Although the majority claims that "the 'preferential treatment' rationale” was not the "sole” purpose in enacting § 362(b)(4), supra at 75-76, it finds no support for that proposition in either the Bankruptcy Code itself or in the Code's legislative history.

. The government’s arguments based on the 1998 amendments to the automatic stay provisions could, if taken to their logical conclusion, result in favoring the government at the expense of other creditors. Since they do not need so to be read, I would avoid that danger, essentially for the reasons given by the majority.

. In his reply brief, Brennan for the first time contends that the district court never ordered him to refrain from "concealing and dissipating assets,” and thus it cannot now order him to show cause why he should not be held in contempt for disobeying such an order. Although Brennan cloaks this argument in jurisdictional terms, it is actually a defense on the merits. Because the district court has not yet held Brennan in contempt, the issue is not properly before us, even were we inclined to consider it given the tardiness with which he has raised it. Cf. Thomas v. Roach, 165 F.3d 137, 146 (2d Cir.1999).